Eugene HARDIN, Movant,

v.

COMMONWEALTH of Kentucky,
Respondent.

Supreme Court of Kentucky.

Oct. 31, 1978.

Frank E. Haddad, Jr., Louisville, Travis
Combs, Jr., LaGrange, for Movant.

Robert F. Stephens, Atty. Gen., Patrick
B. Kimberlin, III, Asst. Atty. Gen., Frank-
fort, for respondent.

STERNBERG, Justice.

The movant was indicted by the Oldham County Grand Jury for wanton endangerment in the first degree (KRS 508.060) and for being a persistent felony offender (KRS 532.080). He was found guilty on the wanton endangerment charge and his penalty was fixed by the jury at three years' imprisonment. In a bifurcated trial, the same jury which had found the movant guilty of wanton endangerment, after hearing the evidence, found him guilty of being a persistent felony offender and fixed his punishment at 15 years in prison. Thereupon, the trial court sentenced the movant to serve 15 years in the penitentiary. The Court of Appeals of Kentucky affirmed the conviction. This court granted discretionary review on two issues only.

I. Is KRS 508.060 defining wanton endangerment in the first degree impermissibly vague so as to be unconstitutional?

Counsel for the movant argues, (1) the statute is not expressed in a manner so that persons charged by the statute can understand the legislative will; (2) persons charged thereunder do not have fair notice of what activity the statute prohibits by its standards; and (3) the statute lacks clear statutory guidelines to prevent arbitrary enforcement.

KRS 508.060 provides as follows:

"Wanton endangerment in the first degree.—(1) A person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person. (2) Wanton endangerment in the first degree is a Class D felony."

The standards by which this court is guided in answering this first issue are set out in *Sasaki v. Commonwealth*, Ky., 485 S.W.2d 897 (1972), and are as follows:

" 'The accepted test in determining the required precision of statutory language imposing criminal liability is whether the language conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. *Anderson v. United States*, 215 F.2d 84 (6 Cir. 1954); and *Roberts v. United States*, 226 F.2d 464 (6 Cir. 1955). This test is qualified to the extent that it is understood that the due process clause of the Constitution does not require impracticable or impossible standards of specificity. *United States v. Carter*, 311 F.2d 934 (6 Cir. 1963).' "

We need to put the commission of the offense of wanton endangerment in its proper setting. The victim, Ricky Ryans, 17 years of age, described the encounter as follows:

"Q. Tell the jury what happened.

A. Well, I come in and me and Gary Smith and Geno Ritter was sitting on the windowsill there in front of the station. There is some bricks there and we were sitting on the windowsill. These two guys drove up in a white pick-up truck. I guess they asked for gas. I don't know, I couldn't hear, but as soon as they pulled up, Geno walked out there and started putting the gas in the truck. Well, this guy, the gas had already been running in the truck for maybe 20 seconds, I guess, and this guy said put some fucking gas in the truck.

Q. The passenger or the driver?

A. The passenger.

Q. Do you see him here in the Courtroom?

A. Yes, sir.

Q. Would you point him out?

A. Right there (pointing).

Q. You have indicated Mr. Hardin?

A. Yes, sir.

Q. What happened then?

A. Well, he said put some fucking gas in the truck and Geno said the gas is already going in the truck. But Geno seen that the guy, you know, there was something wrong with the guy or something, so Geno walked back up there to pump and stood by the pump. Then the guy said, 'Wash this fucking windshield.' And Geno started washing

the windshield. Then he asked—I think he started with Gary Smith first. He asked Gary Smith his name and I think Gary Smith said Gary. Then he asked Geno what was his name. He said Geno. He said, 'Sweetheart,' which he was talking to me and I was standing in front of the door at the building. He said, 'What's your name?'

Q. How far were you away from him?

A. What, from the truck and him?

Q. Mr. Hardin. Was he still in the truck?

A. He had stepped out of the truck. Just outside the door.

Q. How far away was he?

A. From me?

Q. Yes.

A. I would say 20 foot.

Q. Then what happened?

A. Then he said, 'Sweetheart, what's your name?' And I said Ricky. I didn't say it real loud or nothing, but that is just what I said. Then he said, 'Sweetheart, I said what's your name?' I didn't answer him. He said, 'I said, Sweetheart, what's your name?' I still didn't answer him. I had done answered him once. Then he said, 'I'll fix that little bastard' and he reached up on the dash. I didn't see what he got right then, but as soon as he walked around by the truck, Gary Smith said he has got a gun. I looked and I seen he did have a gun.

Q. Did he have it in his hand?

A. Yes. He had it in his hand, no holster or nothing. It was just right in his hand.

Q. Who are you talking about?

A. Eugene Hardin.

Q. Then what happened?

A. Then, he walked up there and Gary Smith was standing right directly in front of me, just the way he was standing, and he pushed Gary Smith out of the way and when he did, he come around and slapped me. Then he called me a little son of a bitch. Then, right then, he said, 'I think I'll just blow your little ass off.'

Q. Did he have the gun with him?

A. Then, when he did, he grabbed the gun with two hands like this (indicating). Then this guy that was riding with him, the driver—I don't see him.

Q. Describe the gun that he had.

A. It was nickel plated. It was a Smith.

Q. Short barrel, long barrel?

A. It was short barrel.

Q. Silver or blue?

A. It was nickel.

Q. Is that white or blue?

A. Sir?

Q. What color was it, white or blue, Ricky?

A. It was white.

Q. Show you a gun that has been previously introduced into evidence. Look at that gun.

A. Yes, sir.

(Reporter's note: Mr. Ryans examines the gun.)

Q. Would the gun he had look anything like that?

A. Yes, sir. It looks identical to it.

Q. You are telling the jury that this looks exactly like the gun he had?

A. Yes, sir.

Q. Where did he have that gun? How close was it to you?

A. One time it wasn't but about 18 inches from my head.

Q. What did he do after he pointed the gun toward you?

A. He said, 'I think I'll blow your little ass off' and when he did, his partner who was driving—he hadn't never got out of the truck as I had seen until then—and I guess when his partner seen that he was really going to shoot me, he come out of the truck and he said, 'You don't want to shoot him. He ain't nothing but a boy.' A boy or a kid one. He said one of the two. And when he did, that guy started turning away and walked from me, but when he did, he doubled his fist and he hit me right here (indicating). That's when he busted my lip and chin.

Q. Who hit you?

A. Eugene Hardin.

Q. Where was the gun when he hit you?

A. In his hand.

Q. Did he hit you with the gun or his other hand?

A. Just his other hand.

Q. How many times did he hit you?

A. Twice as I can recall of.

Q. Did he do anything besides hit you twice?

A. No, sir. Besides calling me some vulgar names and threatened to kill me.

Q. When this other man got out of the truck, what did he do?

A. He grabbed hold of the guy's arm.

Q. Grabbed hold of whose arm?

A. Eugene Hardin's.

Q. Then what did they do?

A. Well, when he grabbed Eugene Hardin, he started to walk away, but as he did, he hit me that time as I told you.

Q. After he hit you, what did he do?

A. Well, he turned around and walked off and I was kind of dizzy then, but I did get in my car and leave. And then when I turned around, I was walking over to my car to get in, I seen him swing at Geno Ritter.

Q. Saw who swing at him?

A. Eugene Hardin. He had walked back over to the truck then. As soon as he got, I don't know, seven feet from me, I started back towards my car, which my car was setting right beside me, beside the building.

Q. Why did you get your car?

A. Because I was scared for my life.

Q. Where did you go?

A. You see, I had just come to work and as I did, I seen the Chief of Police of LaGrange, I seen his car setting there at the Belle of LaGrange and I figured there was a chance it might be there which it was.

Q. Tell the jury, where did you go when you left the station?

A. I went right directly to the Belle of LaGrange, which is less than a mile.

Q. Why did you leave the station?

A. Because I was getting the police.

Q. Was Mr. Hardin there when you left?

A. Yes, sir.

Q. What was the last thing you saw Mr. Hardin do before you left?

A. Swing at Geno Ritter."

All that is required of a statute is fairness. It is not necessary for the statute to be so specific as to delineate the facts of any one condition under which the act of wanton endangerment may be performed, but a general statement is sufficient. The use of words is an art possessed by too few of us. This makes for an obligation on those who possess this art to write so that the rest of us can understand what has been written. Consequently, we must take a "man on the street" approach to normal activities. Has the statute defined what can or cannot be done with such clarity that persons upon whom it is designed to operate can understand it? We think that it does. Does the statute provide fair warning. We think it does. So as to avoid arbitrary treatment, does it provide explicit standards for those persons who apply it—the judge, the jury, the prosecuting attorney, and the arresting officers? We think that it does. Does it prohibit the exercise of any constitutional freedom? We think it does not. We cannot live unto ourselves but must live in a society where the rights of others as well as our own must be considered. While wanton endangerment may be committed in many ways, we cannot conceive of any person who would characterize the movant's conduct as anything other than wanton endangerment.

We hold that KRS 508.060 is constitutional and reject the argument that its terms are vague and not capable of comprehension.

II. Does the persistent felony offender conviction place the movant in double jeopardy?

To clearly understand the movant's argument, we quote from his brief as follows:

"K.R.S. 532.080 dictates the use of separate proceedings for the determination of guilt on the primary and persistent felony offenses. It is within this distinction that the present Kentucky statute is constitutionally infirm."

In his reply brief the movant more succinctly states his attack as follows:

"Appellant merely argues that the particular mechanism chosen by the Kentucky State Legislature to more severely penalize persistent felony offenders is violative of the Double Jeopardy Clause of the Fifth Amendment."

The Fifth Amendment to the United States Constitution guarantees that " * * * nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb * * *." The procedure by which a person charged with being a persistent felony offender is tried is found in KRS 532.080(1), which provides as follows:

"Persistent felony offender sentencing. —(1) When a defendant is found to be a persistent felony offender, the jury, in lieu of the sentence of imprisonment assessed under KRS 532.060 for the crime of which such person presently stands convicted, shall fix a sentence of imprisonment as authorized by subsection (4) of this section. When a defendant is charged with being a persistent felony offender, the determination of whether or not he is such an offender and the punishment to be imposed pursuant to subsection (4) of this section shall be determined in a separate proceeding from that proceeding which resulted in his last conviction. Such proceeding shall be conducted before the court sitting with the jury that found the defendant guilty of his most recent offense unless the court for good cause discharges that jury and impanels a new jury for that purpose."

This statute was adopted by the regular 1974 session of the Kentucky General Assembly as part of the Kentucky Penal Code (Ch. 406, p. 831, p. 873) and became effective January 1, 1975. Insofar as KRS 532.-080 is concerned, it had for its purpose the homogenizing of the treatment of recidivists with the new penal code and uniform proceedings dealing with persistent felony offenders.

■ We have held, and it is universally recognized, that a person who is a persistent felony offender has attained a status. *Sweeny v. Commonwealth*, Ky., 442 S.W.2d 598 (1969). Having attained a status, the persistent felony offender is subject to treatment afforded others in that status and which is inapplicable to those not of that status. The facts necessary to be proven to secure and uphold a conviction on the primary offense are separate and distinct from those necessary to be proven to sustain a conviction as a persistent felony offender. It is impermissible to present to the jury facts upon which a person charged with being a persistent felony offender was initially tried and convicted. *Berning v. Commonwealth*, Ky., 565 S.W.2d 443 (1978). The movant argues that the sentencing for persistent felony offenders is the imposition of additional punishment to that fixed by the jury on a prior conviction. There is no additional punishment imposed by a persistent felony offender conviction, merely a more severe punishment. KRS 532.080 does not create or define a criminal offense. It recognizes a status and, in a proceeding separate and apart from the initial trial, fixes a penalty which is to be imposed rather than the one fixed by the jury on the initial trial. A bifurcated trial such as KRS 532.080 requires is designed to eliminate any unfair influence which the facts necessary to sustain a primary conviction may disclose.

In Brickey "Kentucky Criminal Law." Sec. 29.04, pp. 333, 334, it is stated:

"The Penal Code requires a bifurcated proceeding when the defendant is charged with being a persistent felony offender. Severance of the issues of guilt of the felony with which the actor is presently charged and of determination whether or not he is a persistent felony offender, is designed to remedy the potential prejudice and confusion which could result from considering the defend-

ant's present culpability in light of his past conduct. \* \* \* "

KRS 532.080 provides for a more severe penalty for persistent felony offenders than the penalty which had been fixed by the trial jury on the primary conviction. When we consider the actual mechanism required by KRS 532.080, we find that in truth and in fact no sentence is actually imposed pursuant to the primary conviction prior to the second step in the bifurcated proceeding. The trial jury, if it finds an accused guilty on the primary charge, then proceeds to fix his punishment. The second trial, which is the second step in the bifurcated proceeding, submits to the jury the question of whether the accused is a persistent felony offender. If the jury finds the accused guilty, it then fixes the penalty as designed by statute. Then and only then does the court proceed to enter a judgment sentencing the defendant to a term of imprisonment. On the other hand, if a person charged and tried with being a persistent felony offender is found not guilty, then and in that event the sentence fixed in the trial of the primary offense is imposed.

Although not a white horse case with the instant action, the same principle of constitutional law as declared in *Graham v. West Virginia*, 224 U.S. 616, 32 S.Ct. 583, 56 L.Ed. 917 (1912), is applicable and dispositive of this issue. Graham was convicted for more than one felony offense under an alias name. Thereafter, in a separate proceeding he was tried and convicted of being a habitual criminal. The Supreme Court of the United States found no fault with that bifurcated procedure. We find no fault with the bifurcated procedure provided for in KRS 532.080. It does not place the movant in double jeopardy.

The decision of the Court of Appeals is affirmed.

All concur.