**COMMONWEALTH of Kentucky, Appellant,**

v.

**F.C. "Cedar" FOLEY and Buford Murphy, Appellees.**

**No. 89–SC–646–TR.**

Supreme Court of Kentucky.

Nov. 8, 1990.

Rehearing Denied Dec. 27, 1990.

Frederic J. Cowan, Atty. Gen., John S. Gillig, Ian G. Sonego, Asst. Attys. Gen., Criminal Appellate Div., Jeffrey L. Mackin, Asst. Atty. Gen., Sp. Prosecutions Div., Frankfort, for appellant.

David K. Layton, Lancaster, W. Earl Dean, Dean, Dean & Dean, Harrodsburg, for appellees.

## OPINION OF THE COURT

In this case we undertake the formidable task of deciding the constitutionality of KRS 119.205. In the trial court, the indictment against appellees was dismissed on the grounds that the statute was unconstitutional and the Commonwealth appealed from that order. Upon motion of the Commonwealth, this Court granted transfer.

Appellees Foley and Murphy were indicted for conspiracy to pay money to procure or influence a vote in violation of KRS 119.205. Prior to trial, appellees moved to dismiss the indictment on the grounds that the statute was vague, overbroad, and thus, unconstitutional. Reviewing a number of decisions from this court and various federal courts, the trial court held that the statute fails to provide "fair warning" to those upon whom it is intended to operate, permits "arbitrary treatment" of citizens, and prohibits "conduct which is constitutionally permissible."

▆ As we begin the process of testing the constitutionality of this or any statute against a claim of vagueness or overbreadth, it should be reiterated that the decisions of this Court do not permit introduction of "limiting language" to avoid unconstitutionality.

> "We reject the argument that a criminal statute facially unconstitutional can be 'authoritatively construed' by the courts to render it constitutional, if this is taken to mean the court can introduce an additional concept not present in the statute as written by the Legislature." *Musselman v. Commonwealth*, Ky., 705 S.W.2d 476, 478 (1986).

While our decisions require construction in favor of constitutionality (*Sasaki v. Commonwealth*, Ky.App., 485 S.W.2d 897 (1972); *Fann v. McGuffey*, Ky.App., 534 S.W.2d 770 (1975)), an oft-quoted admonition from *Hatchett v. City of Glasgow*, Ky., 340 S.W.2d 248 (1960), remains a guiding principle:

> "But where a statute on its face is intelligible, the courts are not at liberty to supply words or insert something or make additions which amount, as sometimes stated, to providing for a *casus omissus*, or cure an omission, however just or desirable it might be to supply an omitted provision." *Id.* at 251.

Therefore, it is of no moment that the conduct alleged in the indictment could be constitutionally prohibited and criminalized. The statute must be tested on the basis of what is said rather than what might have

been said. *Musselman v. Commonwealth, supra;* and *Coates v. Cincinnati,* 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971).

We begin our analysis by quoting KRS 119.205 as enacted by the General Assembly. The statute says:

(1) Any person who receives a bribe for his vote at an election, or for his services or influence in procuring a vote at an election, shall be fined not less than one thousand dollars ($1,000) nor more than ten thousand dollars ($10,000) or be confined in the penitentiary for not less than one (1) nor more than five (5) years, or both, and shall be excluded from office and suffrage upon conviction.

(2) Any person who bribes, conspires to bribe another or assists to bribe another shall be fined not less than one thousand dollars ($1,000) nor more than ten thousand dollars ($10,000), or be confined in the penitentiary for not less than one (1) year nor more than five (5) years, or both, and upon conviction shall be excluded from office and suffrage.

(3) 'Bribe,' as used in this section, means any reward, benefit or advantage, present or future, to the person influenced or intended to be influenced, or to another at his instance, or the promise of such reward, benefit or advantage; it includes money or other thing of value given or lent to be wagered on the result of an election, or the promise thereof, or a bet with another that such other will vote for a named candidate, and the gift or promise of a share in any such bet made or to be made.

(4) Any person who received money or thing of value to be used for the purpose of procuring or influencing a vote shall be deemed to have been bribed.

(5)(a) Any candidate or person working on behalf of any candidate who knowingly makes payment to another or any person who receives payment from such candidate, or person for services rendered or goods furnished, including advertising, in excess of that normally charged for such services or goods, shall be guilty of a Class B misdemeanor.

(b) No candidate or committee, or any person on their behalf, shall pay any person more than the reasonable value thereof for transporting voters to the polls on the day of an election. All such payments shall be by check and no portion of such payment shall be paid to any of the persons transported. Any person found guilty of a violation of this subsection shall be guilty of a Class B misdemeanor.

■ Paragraphs (1) and (2) of the statute present no apparent difficulty as these provisions merely impose criminal sanctions upon all parties to the act of bribery. It could not be seriously contended that the Commonwealth is without authority to prohibit the outright buying and selling of votes. As the Supreme Court said in *Brown v. Hartlage,* 456 U.S. 45, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982): "No body politic worthy of being called a democracy entrusts the selection of leaders to a process of auction or barter." 456 U.S. at 54, 102 S.Ct. at 1529. Indeed, Sections 150 and 151 of the Constitution of Kentucky direct the General Assembly to enact laws regulating elections and prohibiting improper practices.

■ Next we focus our attention on KRS 119.205(3). This section prohibits giving any reward, benefit or advantage, including money or other thing of value, to a person influenced or intended to be influenced. Under a literal reading of this section, a virtually endless catalog of campaign practices is proscribed. The distribution of small campaign tokens with the candidate's name and likeness is certainly an accepted practice, but surely such tokens are things of value which are intended to influence voters. The promises made by candidates for office range from simple promises of good government to promises of roads and employment to promises of money. While it may appear absurd to suggest that a candidate's promise of "good government if elected" would subject him to prosecution under this statute, as candidates' campaign promises become more specific, the more plausible it becomes to suggest that the candidate prom-

ised to confer a benefit or advantage with the intention of influencing a voter in violation of the Act. At one extreme, such a promise may be harmless rhetoric, and at the other extreme, an overt act of bribery. Lying between those extremes, however, is a vast middle ground which is subject to characterization as lawful or unlawful in the discretion of a prosecutor or grand jury.

 Upon review of the next section of the Act, KRS 119.205(4), it is apparent that this is redundant, to a great extent, to sections (1) and (3) of the act. Section (1) makes it a crime to receive a bribe and section (3) broadly defines the term "bribe." Nevertheless, section (4) declares that "any person who receives money or other thing of value ... for the purpose of procuring or influencing a vote shall be deemed to have been bribed." The mere fact of redundancy standing alone would not be grounds for constitutional attack, but to the extent section (4) is subject to arbitrary interpretation, it suffers from the same constitutional maladies found in section (3). Moreover, it would be entirely possible to construe section (4), and perhaps earlier sections as well, to prohibit perfectly legitimate business persons from accepting money to be used for the purpose of political advertising. The vast majority of all election expense is for the purchase of television, radio and newspaper advertising. Substantial sums are also spent on other forms of advertising such as billboards and printing of various kinds. That such expenditures are for the purpose of procuring or influencing votes could not be denied, but under section (4), the recipient of such funds, regardless of the value which may have been given or the services rendered in return, "shall be deemed to have been bribed."

 KRS 119.205(5)(a) and (b) introduce the concept of excessive payment by prohibiting any payment "in excess of that normally charged for such services or goods" and "more than the reasonable value thereof." In most instances, candidates and their supporters have no way of determining what is excessive payment or the reasonable value of services rendered. Candidates have little expertise and less time to bargain in the marketplace over charges for goods and services, including advertising, which they need to conduct a campaign. Therefore, these phrases are nearly incapable of application to a particular set of facts, and it is no answer to say that the reasonableness of such charges can be judged by hindsight or that candidates will know what is or is not reasonable.

In recent years the use of professional campaign consultants has become a widespread and accepted practice. Just as attorneys' fees range from relatively modest to very expensive, so too is the range of fees charged by such consultants. Likewise, many candidates employ paid staff persons for clerical, transportation and other services. Under the language employed in sections (5)(a) and (b), every such expenditure of funds would be subject to the reasonableness requirement and only a petit jury could finally determine whether such was met.

 Upon review of KRS 119.205 as a whole, it would not be unreasonable to interpret this Act to prohibit the use of any money or thing of value with the intent to influence voters. Such an interpretation is absurd and repugnant to the concept of free elections. The singular purpose of an election campaign and every undertaking attendant thereto is for the influencing of voters. The idea that candidates may solicit campaign funds and expend money to enhance the likelihood of their election, and at the same time be prohibited from spending money or things of value with the intent to influence voters is inherently contradictory.

The decisions of this Court and the Supreme Court of the United States require that criminal statutes challenged for vagueness contain sufficient precision of statutory language to provide a definite or fair warning when measured by common understanding and practices. *Sasaki v. Commonwealth, supra; Hardin v. Commonwealth*, Ky., 573 S.W.2d 657 (1978); and *Kolender v. Lawson*, 461 U.S. 352, 103

S.Ct. 1855, 75 L.Ed.2d 903 (1983). Authoritative decisions have also invalidated various statutes on grounds of substantial overbreadth. The decisions in this area reflect two primary concerns: that constitutionally protected conduct may be prohibited and that such statutes are susceptible to arbitrary and discriminatory enforcement. *Coates v. Cincinnati, supra; O'Leary v. Commonwealth,* Ky., 441 S.W.2d 150 (1969); and *Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984).

On the issue of vagueness, a leading Kentucky case defining the standard by which we must measure claims of facial unconstitutionality is *Hardin v. Commonwealth, supra.* At issue in *Hardin* was the constitutionality of KRS 508.060 which defines "wanton endangerment" as follows:

"A person is guilty ... when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person."

In deciding whether this statute provided a sufficiently definite warning as to the proscribed conduct, the Court developed the following test. It said:

"Consequently, we must take a 'man on the street' approach to normal activities. Has the statute defined what can or cannot be done with such clarity that persons upon whom it is designed to operate can understand it? ... Does the statute provide fair warning.... [D]oes it provide explicit standards for those persons who apply it—the judge, the jury, the prosecuting attorney, and the arresting officers? ..." *Id.* at 660.

In *Colten v. Commonwealth,* Ky., 467 S.W.2d 374 (1971), this Court relied upon the proposition that a statute is not unconstitutionally vague when it may be understood by citizens who desire to obey it. In so doing, we placed a considerable responsibility upon citizens to determine whether contemplated conduct amounted to a violation. *Colten* elaborated on the view expressed in *O'Leary v. Commonwealth, supra,* that

"[A] criminal law is not unconstitutional merely because it throws upon people the risk of rightly estimating a matter of degree which deals with fixed and actual, as distinguished from imaginary and unascertained, conditions." *Bailey v. Commonwealth,* 235 Ky. 173, 30 S.W.2d 879, 880 (1930).

From the foregoing authorities, we conclude that a proper analysis of a statute claimed to be facially unconstitutional for vagueness is whether a person disposed to obey the law could determine with reasonable certainty from the language used whether contemplated conduct would amount to a violation.

As earlier stated, sections (5)(a) and (b) of KRS 119.205 make it a violation to pay or receive "in excess of that normally charged for such services or goods" and prohibit payment of "more than the reasonable value thereof...." This language is so indefinite that it fails to meet the required standard. The effect of such a statute is to create the potential that any person who engages in the conduct impliedly authorized by sections (5)(a) and (b) will be required to persuade a petit jury that the conduct was within normal or reasonable parameters. A citizen who engages in a legally authorized act should not be forced to guess whether his conduct will later be determined to be a violation of law.

"No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the statute commands or prohibits." *Lanzetta v. New Jersey,* 306 U.S. 451, 453, 59 S.Ct. 618, [619] 83 L.Ed. 888 (1939).

In addition to the vagueness doctrine discussed above, Kentucky constitutional law requires invalidation of statutes which are overly broad.

"The problem here is not that the statute is unintelligible or ambiguous as written, but that it is overbroad as written....

... [T]he statute itself has no such measuring stick, so that, consistent with its terms, in a broad range of cases per-

sons may be found guilty of its violation in circumstances that will infringe constitutional guarantees of free speech." *Musselman v. Commonwealth, supra* at 478.

The Court of Appeals described the overbreadth doctrine in *Commonwealth v. Ashcraft*, Ky.App., 691 S.W.2d 229, 232 (1985), as follows:

"A challenge to a statute on the basis that it is overbroad is essentially an argument that in an effort to control impermissible conduct, the statute also prohibits conduct which is constitutionally permissible."

In *Coates v. Cincinnati*, 402 U.S. at 614, 91 S.Ct. at 1688, *supra*, a city ordinance was held "unconstitutionally broad because it authorizes the punishment of constitutionally protected conduct (assembly)," and in *O'Leary v. Commonwealth, supra,* this Court recognized the possibility of constitutional infirmity by virtue of arbitrary enforcement as follows:

"[F]ree speech and the right of assembly in public places must not be left to the *ad hoc* discretion of provincial authorities,...." *Id.* at 156.

■ From these authorities it is apparent that a statute may be perfectly clear and unambiguous but nevertheless unconstitutional if it prohibits constitutionally protected activities or may be enforced in an arbitrary manner.

In the broadest possible terms, Sections (3) and (4) of KRS 119.205 prohibit, directly or indirectly, the use of things of value to influence voters. In so doing, the General Assembly has swept aside a number of rights secured by the Constitution of Kentucky and the Constitution of the United States.

In *Brown v. Hartlage, supra*, the Supreme Court of the United States forcefully reiterated the right of individuals, including candidates, to engage in "the unfettered interchange of ideas for the bringing about of political and social changes desired by the people." 456 U.S. at 53, 102 S.Ct. at 1529. *See Monitor Patriot Co. v. Roy*, 401 U.S. 265, 271–272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971). The Court said:

"When a state seeks to restrict directly the offer of ideas by a candidate to the voters, the First Amendment surely requires that the restriction be demonstrably supported not only by a legitimate state interest, but a compelling one, and that the restriction operate without unnecessarily circumscribing protected expression." *Brown v. Hartlage*, 456 U.S. at 53–54, 102 S.Ct. at 1529.

Recognizing a legitimate state interest in honest elections, the Court noted a distinction between "a process of auction or barter" and promises made in the course of an election campaign. The Court characterized some such promises as "legitimate, indeed 'indispensable to decision-making in a democracy.'" *Brown v. Hartlage*, 456 U.S. at 55, 102 S.Ct. at 1530. Of significance to the case at bar, the Court made no distinction between campaign promises made to the public at large and promises which appeal to the self-interest of particular voters.

"We have never insisted that the franchise be exercised without taint of individual benefit; indeed, our tradition of political pluralism is partly predicated on the expectation that voters will pursue their individual good through the political process, and that the summation of these individual pursuits will further the collective welfare." *Brown v. Hartlage*, 456 U.S. at 56, 102 S.Ct. at 1530.

While the Court's decision in *Hartlage* was based on the First Amendment to the Constitution of the United States, we are of the opinion that in context the views expressed therein reflect a proper interpretation of Section 1(4) of the Constitution of Kentucky and so hold.

In *Kentucky Milk Marketing and Antimonopoly Commission v. Kroger Co.*, Ky., 691 S.W.2d 893 (1985), this Court construed Section 2 of the Constitution of Kentucky. This section declares that "absolute and arbitrary power over the lives, liberty and property of free men exists nowhere in a republic, not even in the largest majority." In *Milk Marketing,* we characterized Section 2 of our constitution as "broad enough to embrace the traditional concepts

of both due process of law and equal protection of the law." In a compelling statement of limitation upon the exercise of state power, we said:

"Whatever is contrary to democratic ideals, customs and maxims is arbitrary. Likewise, whatever is essentially unjust and unequal or exceeds the reasonable and legitimate interests of the people is arbitrary. *Id.* No board or officer vested with governmental authority may exercise it arbitrarily. If the action taken rests upon reasons so unsubstantial or the consequences are so unjust as to work a hardship, judicial power may be interposed to protect the rights of persons adversely affected." *Id.* at 899.

The views expressed in *Milk Marketing* are directly applicable to the case at bar. The statute as written is so broad and subject to such a vast array of interpretations that it must fail on due process and equal protection grounds. This statute is an open invitation to arbitrary, retaliatory, selective, trivial, and therefore unjust criminal prosecution.

On federal constitutional grounds, the right of candidates to make their views known in an election campaign was reiterated in *Brown v. Hartlage, supra.* It is our view that Section 6 of the Constitution of Kentucky articulates a similar right which is placed at risk by KRS 119.205(3) and (4). Perhaps in this arena, one finds the most pernicious feature of this broadly written statute: the potential it has to chill election participation.

Among the most fundamental of constitutional rights is the right of citizens to involve themselves in the election process. Throughout Kentucky, thousands of citizens undertake support of candidates and parties and devote their time and money to the causes they support. Criminal statutes written in broad general terms and capable of arbitrary and selective enforcement threaten to undermine the willingness of such persons to get involved. No person in his right mind would risk inadvertent violation or arbitrary enforcement and trust only in a reasonable application of the statute. A likely result of the foregoing is the disenfranchisement of many citizens and an infringement of their rights under Section 6 of the Constitution of Kentucky.

While a number of other Kentucky constitutional rights may be implicated or infringed by the statute before the Court, we find it unnecessary to prolong this discussion. We have held KRS 119.205(3) and (4) violative of Sections 1(4) and 2 of the Constitution of Kentucky and note the very real possibility that it may also violate Section 6.

Our decision to invalidate KRS 119.205 in its entirety has not been reached upon the basis of speculation as to the infringement of constitutional rights nor has it been achieved without considerable reluctance. We are not unmindful that enactment of this statute was motivated by a desire to curtail or eliminate the abominable practice of vote-buying and punish those who would subvert the democratic process. This Court is at liberty to invalidate duly enacted statutes only in the presence of "a realistic danger that the statute will significantly compromise recognized [constitutional] protections of parties not before the court...." *Los Angeles v. Taxpayers for Vincent, supra,* 466 U.S. at 801, 104 S.Ct. at 2126. For a facial challenge on overbreadth grounds to prevail, real, substantial and basic constitutional rights must be at risk. This Court has determined that KRS 119.205 lacks minimal objective guidelines for its application and therefore threatens the constitutional rights of all Kentucky citizens.

The judgment of the trial court is affirmed.

STEPHENS, C.J., and COMBS, LAMBERT and LEIBSON, JJ., concur.

VANCE, J., dissents by separate opinion in which GANT and WINTERSHEIMER, JJ., join.

VANCE, Justice, dissenting.

Respectfully, I dissent. We have repeatedly held that when there are two reasonable interpretations of the language of an act of the General Assembly, one of which would uphold the constitutionality of

the act, and the other of which would render it unconstitutional, it is the duty of the Court to uphold the constitutionality of the act.

The majority opinion invalidates the laws of Kentucky pertaining to "vote buying" and leaves us defenseless against election frauds because of the virtual impossibility of drafting a statute which specifically denominates in every instance the exact limits at which attempts to influence voters passes beyond that which is considered permissible and thereby becomes impermissible.

I believe the majority opinion goes astray in its interpretation of the word "influence" as used in the statute. Influence comes in all sizes, shapes, and degrees. When a bank robber stands at a teller's cage and demands money, he is attempting to influence the actions of the teller. This constitutes an attempt to influence in an obligatory manner in which the person sought to be influenced is obligated to respond.

But many attempts to influence are simply efforts to persuade, and the person sought to be influenced is not obligated in any degree whatsoever.

I would interpret the word "influence," as used in the statute, to mean influence which seeks to obligate rather than influence which only seeks to persuade.

Thus, when a candidate gives a voter a candidate card or a pencil with his name on it, or when he purchases advertisements in the media, he is seeking to influence voters by persuasion, but they do not incur thereby any obligation to him. On the other hand, when a candidate offers a person $10.00 to vote for him, it is his intention, at least, that the recipient of the money will be obligated to so vote. This is an attempt to use obligatory influence and would violate the statute. Likewise, the gift of anything of such great value as would, within reason, constitute an attempt to create an obligation on the part of the recipient would violate the statute.

This places a burden upon the citizenry to use common sense and reason in drawing the line between what is acceptable and what is not acceptable, but this court has held in *O'Leary v. Commonwealth*, Ky., 441 S.W.2d 150 (1969):

"It is firmly established that a criminal law is not unconstitutional merely because it throws upon people the risk of rightly estimating a matter of degree which deals with fixed and actual, as distinguished from imaginary and unascertained, conditions."

The risk of rightly estimating when the gift by a candidate of things of value goes beyond that which can, under the circumstances, reasonably constitute payment for services rendered and becomes, in fact, an attempt to purchase the vote or influence of the recipient does not render the statute invalid. The standard is reasonableness, and reasonableness is an acceptable measure of conduct.

There is no question whatever but that a person of ordinary understanding would comprehend that the acts with which appellees are charged would violate K.R.S. 119.-205. They cannot claim that because of its vagueness they did not understand that the conduct of which they are accused is illegal.

Although they are not charged with the offer of a thing of insignificant intrinsic value such as a candidate card or a pencil in an effort to persuade, they contend the statute must be struck down in its entirety because conceivably some person some day might be so charged. I would interpret the statute in such a manner that it does not criminalize conduct which is intended only to exercise an influence to persuade as contrasted with conduct which is intended to obligate a voter.

I would uphold the constitutionality of K.R.S. 119.205 against the challenge presented by these appellees.

GANT and WINTERSHEIMER, JJ., join in this dissent.