Andrew J. MARTIN; Danny Ross; Lon Fields; and Robert Winstead, Appellants/Cross–Appellees,

v.

COMMONWEALTH of Kentucky, Appellee/Cross–Appellant.

Nos. 2000–SC–1101–DG, 2001–SC–0675–DG.

Supreme Court of Kentucky.

Jan. 23, 2003.

M. Holliday Hopkins, Louisville, William E. Johnson, Johnson, Judy, True & Guarnieri, LLP, Frankfort, Sheryl G. Snyder, Amy D. Cubbage, Brown, Todd & Heyburn, PLLC, Louisville, Counsel for Appellant/Cross–Appellee Andrew J. Martin.

Thomas L. Osborne, Whitlow, Roberts, Houston & Straub, Paducah, Phillip J. Shepherd, Frankfort, Counsel for Appellant/Cross–Appellee Danny Ross.

Samuel B. Carl, Carl, Head & Triplett, Louisville, Counsel for Appellant/Cross–Appellee Lon Fields.

J. Bart Adams, Alton D. Priddy, Priddy, Isenberg, Miller & Meade, PLLC, Louis-

ville, Counsel for Appellant/Cross–Appellee Robert Winstead.

A.B. Chandler, III, Attorney General, Janet M. Graham, Jennifer L. Carrico, Assistant Attorneys General, Criminal Appellate Division, Office of the Attorney General, Frankfort, Counsel for Appellee/Cross–Appellant Commonwealth of Kentucky.

John K. Bush, Christie A. Moore, Greenebaum, Doll & McDonald, PLLC, Louisville, Counsel for Amicus Curiae United States Senator Mitch McConnell (2000–SC–1101–DG).

COOPER, Justice.

This concludes the second chapter of this protracted investigation and prosecution of alleged election campaign finance law violations during the 1995 Kentucky gubernatorial election campaign. In chapter one, we upheld the authority of the grand jury to investigate and return indictments for such violations. *Democratic Party of Kentucky v. Graham*, Ky., 976 S.W.2d 423 (1998). Today, we hold that the statutes under which Appellants now stand indicted are neither unconstitutional as applied nor unconstitutionally vague or overbroad. Whether the alleged conduct of Appellants falls within the coverage of those provisions must await chapter three, for there is no summary judgment procedure in a criminal case in Kentucky. *Commonwealth v. Hayden*, Ky., 489 S.W.2d 513, 516 (1972); *Commonwealth v. Hay*, Ky.App., 987 S.W.2d 792, 794–95 (1998); *Commonwealth v. Hamilton*, Ky.App., 905 S.W.2d 83, 84 (1995).

## I. THE STATUTES.

In 1995, the relevant provisions of KRS chapters 121 and 121A provided in perti-

nent part as follows (words, phrases and provisions deemed by Appellants to render the statutes unconstitutional are designated in boldface print):

*KRS 121.015(6):*

"Contribution" means any:

(a) Payment, distribution, loan, deposit, or gift of money or other thing of value, to a candidate, his agent, a slate of candidates, its authorized agent, a committee, or contributing organization...;

(b) Payment by any person other than the candidate, his authorized treasurer, a slate of candidates, a committee, or a contributing organization, of compensation for the personal services of another person which are rendered to a candidate, slate of candidates, committee, or contributing organization ...;

(c) Goods, advertising, or services with a value of more than one hundred dollars ($100) in the aggregate in any one (1) election which are furnished to a candidate, slate of candidates, committee, or contributing organization ... without charge, or at a rate which is less than the rate normally charged for the goods or services;

. . .

**(e) Expenditure in connection with any other activity undertaken independently of the activities of a candidate, slate of candidates, committee, or contributing organization made or furnished for the purpose of influencing the results of an election;** [1]

*KRS 121.015(7):*

Notwithstanding the foregoing meanings of "contribution," the word shall not be construed to include:

---

1. This subsection was deleted by the 1996 General Assembly. 1996 Ky. Acts, ch. 153, § 4.

(a) Services provided without compensation by individuals volunteering a portion or all of their time on behalf of a candidate, committee, or contributing organization;

. . .

*KRS 121.150(1):*[2]

(a) No contribution of money or other thing of value, nor obligation therefor, shall be made or received, and no expenditure of money or other thing of value shall be made or incurred, **directly or indirectly**, other than an "independent expenditure," . . . to support or defeat a candidate [or] slate of candidates . ., except through the duly appointed campaign manager, or campaign treasurer of the candidate [or] slate of candidates . . . .

(b) As used in this section, "independent expenditure" means one made for a communication which expressly advocates the election or defeat of a clearly identified candidate or slate of candidates . . . and which is not made with any **direct or indirect** cooperation, consent, request, suggestion, or **consultation involving a candidate**, slate of candidates, . . or agent.[3]

(c) No candidate, slate of candidates, campaign committee, political issues committee, nor anyone acting on their behalf shall have **any communication** with another person nor anyone on his behalf regarding that person's making of an independent expenditure on behalf of the candidate [or] slate . . . prior to the time the independent expenditure is made.[4]

(d) Any person making an "independent expenditure," as defined in this subsection, shall report these expenditures when the expenditures exceed five hundred dollars ($500) in the aggregate in any one (1) election on a form provided by the registry and shall sign a statement on the form, under penalty of perjury, that the expenditure was an actual independent expenditure and that there was no prior communication with the campaign on whose behalf it was made.

*KRS 121.150(12):*

No person shall make a payment, distribution, loan, advance, deposit, or gift of money to another person to contribute to a candidate, committee, contributing organization, or anyone on their behalf. No candidate, committee, contributing organization, nor anyone on their behalf shall accept a contribution made by one (1) person who has received a payment, distribution, loan, advance, deposit or gift of money from another person to contribute to a candi-

---

2. This provision contained four separate and distinct sub-provisions that were not separately enumerated. We have taken the liberty of dissecting the provision and designating those sub-provisions as (a), (b), (c) and (d) for purposes of clarity and analysis.

3. In 1996, this definition was deleted from KRS 121.150(1), recompiled as KRS 121.015(12), and amended to read as follows: " 'Independent expenditure' means the expenditure of money or other things of value for a communication which expressly advocates the election or defeat of a clearly identified candidate or slate of candidates, and which is made without any coordination, consultation or cooperation with any candidate, slate of candidates, campaign committee, or any authorized person acting on behalf of any of them, and which is not made *in concert with or at the request or suggestion of* any candidate, slate of candidates, campaign committee, or any authorized person acting on behalf of any of them." 1996 Ky. Acts, ch. 153 §§ 3, 4 (emphasis added).

4. This provision was added to KRS 121.150(1) by the 1994 General Assembly and deleted therefrom by the 1996 General Assembly. 1994 Ky. Acts, ch. 458, § 8; 1996 Ky. Acts, ch. 153, § 3.

date, committee, contributing organization, or anyone on their behalf.

*KRS 121.056(1):*

No person who contributes more than the maximum legal contribution established by KRS 121A.050 in any one (1) election to a slate of candidates for Governor and Lieutenant Governor that is elected to office shall hold any appointive state office or position, which shall be made by gubernatorial appointment, during the term of office following the campaign in which the contribution shall be made.

*KRS 121A.050(1):*

. . . Except for independent expenditures, as defined in KRS 121.150(1), no natural person . . . shall **knowingly** make a contribution of more than five hundred dollars ($500) in any one (1) election to a slate of candidates that has filed a statement of intent to accept transfers from the fund and abide by the maximum expenditure limit. . . .

*KRS 121.990(3):*

Any person who **knowingly** violates any of the provisions of . . . [KRS] 121.150 to 121.230 . . . or KRS Chapter 121A, shall, for each offense, be guilty of a Class D felony.

*KRS 121.015(10):*

"Knowingly" means, with respect to conduct or to a circumstance described by a statute defining an offense, that a person **is aware or should have been aware** that his conduct is of that nature or that the circumstance exists.

## II. THE INDICTMENT.

In 1995, Lieutenant Governor Paul Patton and Dr. Stephen Henry were, respectively, the Democratic candidates for governor and lieutenant governor of Kentucky. Because the slate filed a statement of intent to accept partial public financing of its campaign, it was required to limit its campaign expenditures to a total of $1,800,000, of which $600,000 would be raised by campaign contributions to the slate and $1,200,000 would be paid to the slate by the publicly financed election campaign fund. KRS 121A.030(1); KRS 121A.080(1). Appellant Andrew Martin was the slate's campaign manager. Appellant Danny Ross was a full-time state employee working as a "labor liaison" in Lieutenant Governor Patton's office. Appellant Lon Fields was the president of Local 89 of the General Drivers, Warehousemen and Helpers Union ("Teamsters") and secretary-treasurer of Joint Council 94, the local Teamsters political action committee (PAC). Appellant Robert Winstead was secretary/treasurer of Local 89 and recording secretary of Joint Council 94.

On July 18, 1995, Ross resigned his position as the lieutenant governor's "labor liaison" and commenced employment with Joint Council 94 as a "labor coordinator." He was hired to work through December 12, 1995, at a total salary of $20,000, to be paid one-half by Joint Council 94 and one-half by the International Brotherhood of Teamsters' Democratic Republican Independent Voter Education Committee (IBT DRIVE), the Teamsters' national PAC. On August 1, 1995, IBT DRIVE forwarded its check for $10,000 to Joint Council 94 as "reimbursement for 1/2 of Danny Ross salary." Joint Council 94 subsequently assigned Ross to work as a "political liaison" for AFL–CIO locals in Kentucky. Joint Council 94, however, continued to pay Ross's salary. On November 9, 1995, two days after the general election (won by the Patton/Henry slate), Ross resigned his employment with Joint Council 94 and returned to his former position in Lieutenant Governor Patton's office. Shortly after taking office as governor, Patton appointed Fields to the Kentucky Racing Commis-

sion, a position that gives him access to such perquisites as box seats at the Kentucky Derby, and appointed Winstead to the Kentucky Occupational Safety and Health Review Commission, a position that pays him $19,400 per year (in addition to the pay he receives from his regular employment).

The Commonwealth alleges that Ross's real job from July 18 to November 9, 1995, was that of full-time labor coordinator for the Patton/Henry campaign and that Fields and Winstead, at the instigation of Martin and Ross, induced the Teamsters PACs to pay Ross's salary so that the slate would not have to deduct it from the $1,800,000 maximum expenditure limit permitted by KRS 121A.030(1), *i.e.*, money not paid to Ross was money that could be used for, *e.g.*, television advertisements. In essence, the theory of the indictment is that the payment of Ross's $20,000 salary and/or the in-kind loan of Ross's services to the campaign [5] (either alone or in complicity with others) was but a disguised contribution to the slate made in violation of KRS 121.150(1) (Count I—a contribution not paid to the campaign manager or treasurer), KRS 121.150(12) (Count II—a payment made to another to contribute to the campaign), and KRS 121A.050(1) (Count V—a contribution in excess of $500). Count III of the indictment charges that Appellants solicited and obtained the gubernatorial appointments for Fields and Winstead as rewards for their successful efforts to induce the Teamsters PACs to pay the salary of a campaign employee and/or to arrange for the in-kind loan of Ross's services, and that their ap-

pointments were, therefore, obtained in violation of KRS 121.056(1).

According to the bill of particulars, Count IV of the indictment pertains to three separate incidents involving only Martin and/or Ross that are alleged to constitute violations of KRS 121.150(1). The first incident occurred in early November 1995 and involved an expenditure by the National Council for Senior Citizens PAC, a political action committee affiliated with the AFL–CIO. The Commonwealth alleges that the PAC contacted Clarence Frost, a PAC director for the national AFL–CIO, and advised him that it wanted to spend $10,000 on Patton/Henry radio advertisements. Frost is alleged to have called Martin to obtain assistance in writing the advertisements, and Martin is alleged to have directed Frost to the Patton/Henry slate's advertising firm. Frost called the advertising firm and requested that two advertisements be drafted. The firm drafted the advertisements and allegedly forwarded them to Patton/Henry campaign headquarters in Louisville which then faxed the advertisements to Frost who delivered them to the PAC. The PAC expended a total of $8,197.34 on the advertisements which it reported as an "independent expenditure." The Commonwealth claims the expenditure was an illegal "contribution" because the expenditure was made with "direct or indirect cooperation ... or consultation" with Martin and was not paid through the slate's campaign manager or treasurer.

The second incident occurred on November 4, 1995, when a Mr. and Mrs. Boyer allegedly informed Patton/Henry campaign

---

**5.** *Federal Election Comm'n v. National Rifle Ass'n of America,* 254 F.3d 173, 183–87 (D.C.Cir.2001) (use of employees of not-for-profit association in candidate's campaign was a "contribution"); *California Med. Ass'n v. Federal Election Comm'n,* 641 F.2d 619, 630 (9th Cir.1980)(value of administrative ser- vices donated to campaign was a "contribution"), *aff'd* 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981); *Federal Election Comm'n v. Friends of Jane Harman,* 59 F.Supp.2d 1046, 1057 (C.D.Cal.1999) (services provided by corporate employees at campaign's fundraiser constituted a "contribution").

workers of their desire to contribute $5,000 to the campaign. The Commonwealth claims the Boyers, at Martin's direction, delivered to Martin two checks for $2,500 each payable to the Kentucky Democratic Party. Martin caused the checks to be delivered to Democratic Headquarters which reported them as contributions to the Democratic Party. The Commonwealth alleges that, in reality, the Boyer money was spent that same day on Patton/Henry advertisements at the request or suggestion of, or in consultation with, Martin; thus, the Commonwealth asserts, the purchases of the advertisements were not independent expenditures by the Democratic Party but were illegal contributions made to the Patton/Henry slate at Martin's instigation.

The third incident pertains to the so-called "Trumka fly-around" on November 5, 1995. The Commonwealth alleges that Martin and Ross arranged for Richard Trumka, former president of the United Mine Workers of America and recently elected secretary-treasurer of the AFL–CIO, to accompany Patton and labor union dignitaries on a chartered flight to various political rallies attended primarily by union members. Although Patton was the only Democratic candidate to participate in the fly-around, its cost, $3,878.62, was paid by the Kentucky Democratic Party Executive Committee. The Commonwealth contends this was not an independent expenditure by the Democratic Party but an illegal contribution made at the request or suggestion of, or in consultation with, Martin and Ross on behalf of the Patton/Henry slate.

The trial judge dismissed the indictment because he believed that the definitions of "contribution" and "independent expendi-

ture" in the 1995 versions of KRS 121.015(6) and KRS 121.150(1) were unconstitutionally overbroad in that those provisions "do not permit political activity protected by the First Amendment;" and that the definition of "knowingly" in KRS 121.015(10) was unconstitutionally vague because "no specific intent by the Defendants is required by the statute to prove any criminal conduct on behalf of the Defendants." A split panel of the Court of Appeals disagreed and reversed and remanded for further proceedings. We granted discretionary review and now affirm the Court of Appeals.

### III. BUCKLEY V. VALEO.

Any First Amendment analysis of Kentucky's Campaign Finance Regulation Act, KRS chapter 121, and Public Financing Campaign Act, KRS chapter 121A, necessarily begins with *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), the United States Supreme Court's seminal opinion construing similar provisions in the Federal Election Campaign Act of 1971 (FECA),[6] as amended in 1974.[7] *See Nixon v. Shrink Missouri Government PAC*, 528 U.S. 377, 382, 120 S.Ct. 897, 901, 145 L.Ed.2d 886 (2000) ("We hold *Buckley* to be authority for comparable state regulation, which need not be pegged to *Buckley*'s dollars."). The 1974 FECA amendments provided for partial public financing of federal elections and limitations on campaign contributions and expenditures. They also established the Federal Election Commission to enforce compliance with those provisions. These amendments were enacted largely in reaction to the "Watergate" scandal and the large sums of money raised and spent by President Nixon's 1972 re-election campaign. *See* Jennifer A. Moore, Note, *Cam-*

---

6. Pub.L. No. 92–225, 86 Stat. 3.

7. Pub.L. No. 93–443, 88 Stat. 1263; 1 U.S.C. § 431, *et seq.*

*paign Finance Reform in Kentucky: The Race for Governor*, 85 Ky. L.J. 723, 728 (1996–97), *citing* Robert E. Mutch, *Campaigns, Congress, and Courts: The Making of Federal Campaign Finance Law* 47–49 (1988) *and* Herbert E. Alexander, *Financing Politics: Money, Elections, and Political Reform* 1, 20 (4th ed.1992). Similarly, the 1992 amendments of KRS chapter 121 and enactment of KRS chapter 121A, adopting similar reforms, were largely in reaction to the so-called "BOP-TROT" scandal and the large sums of money spent during the 1987 and 1991 gubernatorial campaigns. Moore, *supra*, at 723–25.

Although the United States Supreme Court has addressed campaign finance issues in a number of cases since *Buckley*, those decisions have mostly involved applications of *Buckley* to variations on facts and issues. *E.g., Federal Election Comm'n v. Colorado Republican Federal Campaign Comm.* ("*Colorado II* "), 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (applying *Buckley* to expenditures by political parties); *Federal Election Comm'n v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986) (applying *Buckley* to expenditures by non-profit corporations); *Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (applying *Buckley* to expenditures by political action committees); *California Med. Ass'n v. Federal Election Comm'n*, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (applying *Buckley* to expenditures by individuals and associations). Accordingly, our task is to apply *Buckley* to the facts and issues giving rise to these indictments. Those aspects of *Buckley* dealing with campaign finance matters not at issue in this case, *e.g.*, limitations on total campaign expenditures, limitations on expenditures by a candidate from personal funds, reporting and disclosure requirements, etc., need not be addressed.

At the outset, *Buckley* held that restrictions on contributions and expenditures implicate the First Amendment freedoms of speech and association, 424 U.S. at 16–25, 96 S.Ct. at 633–37, and rejected an argument that such limitations were merely expressive conduct akin to burning a draft card and, therefore, subject to "*O'Brien* intermediate scrutiny for communicative action." *Shrink Missouri, supra*, at 386, 120 S.Ct. at 903, *citing United States v. O'Brien*, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). Similarly, *Buckley* confirmed that FECA's ceilings on expenditures and contributions could not be sustained merely as reasonable "time, place, and manner" restrictions. *Buckley, supra*, at 17–18, 96 S.Ct. at 634. FECA's ceilings, it held, "impose[d] direct quantity restrictions on political communication and association ... in addition to any reasonable time, place, and manner restrictions otherwise imposed." *Id.*

However, though holding that limitations on both expenditures and contributions implicate First Amendment interests, *Buckley* found that the levels of constitutional infringement accompanying each subject of regulation differed. Limitations on "expenditures," or the amount one may independently spend in favor of a political position or candidate, constitute a direct and substantial limitation on political speech. *Buckley, supra*, at 19, 96 S.Ct. at 634–35.

A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of

communicating ideas in today's mass society requires the expenditure of money. *Id.*

Limitations on "contributions," or the amount that one may contribute to a candidate or political committee, however, were found to create only a "marginal restriction" on the contributor's First Amendment rights, *id.* at 20–21, 96 S.Ct. at 635, because a contribution does little more than communicate "a general expression of support for a candidate and his views," through "the symbolic act of contributing." *Id.* at 21, 96 S.Ct. at 635. The First Amendment interest primarily implicated by a contribution is the right of political association. *Id.* at 24–25, 96 S.Ct. at 637. This expression of association is not affected by the amount or size of the contribution which, at best, conveys "a very rough index of the intensity of the contributor's support for the candidate." *Id.* at 21, 96 S.Ct. at 635–636. As a matter of necessity, "the transformation of contributions into political debate involves speech by someone other than the contributor." *Id.* at 21, 96 S.Ct. at 636. Thus, limitations on contributions (not amounting to a ban) do not pose a great threat to political speech.

Importantly, *Buckley* also noted that contributions may come clothed as expenditures. "The expenditure of resources at the candidate's direction," *Buckley* found, was for First Amendment purposes no different than a direct monetary contribution. *Id.* at 36–37, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659. Therefore, *Buckley* approved FECA's treatment of prearranged or coordinated expenditures as "contributions." *Id.* at 46–47 and n. 53, 96 S.Ct. at 647–48 and n. 53. *See also Colorado II, supra,* at 440–42, 121 S.Ct. at 2358–59. Only truly "independent expenditures" differ functionally from cash gifts for purposes of the First Amendment. *Id.* Buckley also upheld the inclusion of "in-kind

assistance" within the definition of a "contribution" because it "provides material financial assistance to a candidate." *Id.* at 36, 96 S.Ct. at 643.

> The ultimate effect is the same as if the person had contributed the dollar amount to the candidate and the candidate had then used the contribution to pay for [*e.g.*] the fundraising event or the food.... Treating these expenses as contributions when made to the candidate's campaign or at the direction of the candidate or his staff forecloses an avenue of abuse without limiting actions voluntarily undertaken by citizens independently of a candidate's campaign.

*Id.* at 36–37, 96 S.Ct. at 643. Thus, whether a contributor offers a cash gift or supplies in-kind assistance or advertisements in coordination with the candidate, governmental limitations on such contributions impact the First Amendment in only a "marginal" way. *Id.* at 20–21, 96 S.Ct. at 635.

■ Accordingly, *Buckley* and its progeny have established that limitations on truly independent expenditures must be "narrowly tailored" to serve a "compelling" governmental interest, while limitations on contributions need only be "closely drawn" to match a "sufficiently important" governmental interest. *Buckley, supra,* at 24–25, 44–45, 96 S.Ct. at 637–38, 647; *Shrink Missouri, supra,* at 386–88 and n. 3, 120 S.Ct. at 903–05 and n. 3. *See also Beaumont v. Federal Election Comm'n,* 278 F.3d 261, 271 (4th Cir.2002); *Daggett v. Commission on Governmental Ethics and Election Practices,* 205 F.3d 445, 454, 464 (1st Cir.2000); *Service Employees Int'l Union v. Fair Political Practices Comm'n,* 955 F.2d 1312, 1322 (9th Cir.1992); *Opinion of the Justices to the House of Representatives,* 418 Mass. 1201, 637 N.E.2d 213, 216 (1994).

*Buckley* concluded that there was a compelling and sufficiently important governmental interest in preventing corruption and the appearance of corruption arising from the real or imagined coercive influence of large financial contributions on candidates' positions and on their conduct if elected to office, especially *quid pro quo* arrangements between contributors and potential office holders that undermine the integrity of representative democracy. *Id.* at 25–29, 96 S.Ct. at 638–39. Thus, the only question was whether FECA's limitations were sufficiently tailored for purposes of the First Amendment to meet that interest.

The $1,000 limitation on contributions in former 18 U.S.C. § 618(b)[8] easily met this test. The Court found that it was closely drawn because it focused precisely on the problem to be solved—potential corruption related to large campaign contributions—but otherwise did not substantially affect opportunities to engage in independent political expression and association or undermine to any material degree "the potential for robust and effective discussion of candidates and campaign issues by individual citizens, associations, the institutional press, candidates, and political parties." *Id.* at 28–29, 96 S.Ct. at 639–40.

However, a different result was required with respect to the $1,000 limitation on "independent expenditures" in former 18 U.S.C. § 608(e)(1).[9] As noted, this restriction required subjection to the highest scrutiny. The Court's analysis proceeded in two main steps. First, former § 608(e)(1) was subject to a vagueness analysis pursuant to *NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), which requires that Congress regulate in the area of the First Amendment

"only with narrow specificity." *Id.* at 418, 83 S.Ct. at 338. As written, former § 608(e)(1) literally prohibited all individuals from making expenditures in excess of $1,000 "relative to a clearly identified candidate." *Buckley, supra,* at 39–40, 96 S.Ct. at 644–45. The phrase "relative to" was held too indefinite in that it "fail[ed] to clearly mark the boundary between permissible and impermissible speech...." *Id.* at 41, 96 S.Ct. at 645. Therefore, *Buckley* construed that language as applying "only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate," *id.* at 44, 96 S.Ct. at 646–47, otherwise referred to as "express advocacy." *Massachusetts Citizens for Life, supra,* 479 U.S. at 249, 107 S.Ct. at 623. In addition to avoiding the vagueness challenge, this interpretation attempted to make former § 608(e)(1) as constitutionally palatable as possible by leaving unregulated "funds spent [independently] to propagate one's views on issues without expressly calling for a candidate's election or defeat," *Buckley, supra,* at 44, 96 S.Ct. at 646 (quotation omitted), otherwise referred to as "issue advocacy." *Massachusetts Citizens for Life, supra* at 252 n. 6, 107 S.Ct. at 625 n. 6.

Nevertheless, even narrowed to cover only express advocacy, former 18 U.S.C. § 608(e)(1) was held to be unconstitutionally overbroad. Most importantly, *Buckley* found that independent expenditures for express advocacy posed little danger of real or apparent corruption. 424 U.S. at 46, 96 S.Ct. at 648. The fact that coordinated expenditures were treated as "contributions" by FECA alleviated much of the concern that corrupt donors would

---

**8.** Repealed, Pub.L. No. 94–283, Title II, § 201(b), 90 Stat. 496 (1976). Now *see* 2 U.S.C. § 441a.

**9.** Repealed, Pub.L. No. 94–283, Title II, § 201(a), 90 Stat. 496 (1976).

mask their contributions as expenditures. *Id.* at 47, 96 S.Ct. at 648.

> The absence of prearrangement and coordination of an expenditure with the candidate or his agent ... alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate. Rather than preventing circumvention of the contribution limitations, § 608(e)(1) severely restricts all independent advocacy despite its substantially diminished potential for abuse.

*Id.*

Thus, in the discussions most relevant to this case, *Buckley* upheld FECA's limits on contributions, but struck down FECA's limits on truly independent expenditures. As the Court has recently noted, "[l]ater cases have respected this line between contributing and spending." *Colorado II, supra,* 533 U.S. at 437, 121 S.Ct. at 2356.

### IV. "AS APPLIED."

■ Appellants attack the constitutionality of the 1995 version of our campaign finance laws both "as applied" and as "facially overbroad." Generally, a person to whom a statute may constitutionally be applied cannot challenge it on the ground that it may conceivably be applied unconstitutionally to others in other situations not before the Court. *Broadrick v. Oklahoma,* 413 U.S. 601, 610, 93 S.Ct. 2908, 2915, 37 L.Ed.2d 830 (1973). However, there is an exception with respect to statutes restricting First Amendment rights. *Id.* at 612, 93 S.Ct. at 2916 (*citing Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 1116, 1121, 14 L.Ed.2d 22 (1965)). That is "because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression." *Broadrick, supra,* at 612, 93 S.Ct. at 2916. *Dombrow-*

*ski* referred to this as a "chilling effect upon the exercise of First Amendment rights." 380 U.S. at 487, 85 S.Ct. at 1121.

There is general agreement that the "as-applied" issue should be addressed first, for if the statute is unconstitutional as applied, there is no need to address the more complicated issue of "facial overbreadth."

> [T]he overbreadth question is ordinarily more difficult to resolve than the as-applied, since it requires determination whether the statute's overreach is *substantial,* not only as an absolute matter, but "judged in relation to the statute's plainly legitimate sweep," *Broadrick v. Oklahoma, supra,* at 615, 93 S.Ct., at 2917, and therefore requires consideration of many more applications than those immediately before the court. Thus, for reasons relating both to the proper functioning of courts and to their efficiency, the lawfulness of the particular application of the law should ordinarily be decided first.

*Board of Trustees of State Univ. of New York v. Fox,* 492 U.S. 469, 485, 109 S.Ct. 3028, 3037, 106 L.Ed.2d 388 (1989) (emphasis in original). Thus, ordinarily, we would first undertake a comprehensive "as applied" analysis of the constitutionally objectionable provisions.

■ However, Appellants' "as applied" challenge can be dismissed simply because the provisions of which they complain are not being applied to them. The primary First Amendment violations claimed by Appellants are that (1) KRS 121.015(6)(e) included within the definition of "contribution" exactly the type of independent activity that *Buckley* held could not be restricted; (2) the definition of "independent expenditure," KRS 121.150(1)(b) (as dissected), required the expenditure to be made without "consultation involving a ... candidate," which could include, *e.g.,* a con-

sultation with a third party about the candidate or a mere inquiry of the candidate as to his/her position on a particular issue for the purpose of determining whether to make an independent expenditure; and (3) KRS 121.150(1)(c) (as dissected) prohibited "any communication" between the campaign and a potential independent spender about the expenditure before the expenditure was made. We agree that these provisions were facially unconstitutional for precisely the reasons stated by Appellants.

Nevertheless, the bases for Appellants' attack on these provisions are inapposite to the conduct charged in the indictment. First, Appellants are not even charged under KRS 121.015(6)(e). Second, although Appellants are charged under KRS 121.150(1), the language of which they complain in KRS 121.150(1)(b) (as dissected) is irrelevant to their allegedly criminal conduct. Appellants were indicted for making contributions (as principals or accomplices) in the form of "coordinated" expenditures to the Patton/Henry slate other than through the slate's campaign manager or treasurer. The indictment (as defined by the bill of particulars) does not allege that the expenditures were contributions because they were made e.g., after consultation with a third party about the candidate or a mere inquiry as to the candidate's position on a particular issue. Instead, the indictment alleges that the expenditures were contributions because the details as to content, timing, place, nature, or volume of the communications for which the expenditures were made were coordinated with agents of the Patton/Henry slate. Finally, the expansive reference to "any communication" in KRS 121.150(1)(c)(as dissected) is also irrelevant

to the indictment. Appellants were not indicted for "communicati[ng] with another person or anyone on his/her behalf regarding that person's making of an independent expenditure." KRS 121.150(1)(c) (as dissected). They were indicted for making contributions (as principals or accomplices) to a slate of candidates other than through the slate's campaign manager or treasurer. KRS 121.150(1)(a) (as dissected).

Thus, although the above three provisions, all of which were either repealed or amended in 1996,[10] were either wholly or partially facially unconstitutional, as discussed in more detail *infra*, those unconstitutional aspects are not being applied to Appellants.

## V. OVERBREADTH.

### A. Facial Overbreadth.

As noted in the preceding "as applied" analysis, we agree that KRS 121.015(e), KRS 121.150(1)(b) (as dissected), and KRS 121.150(1)(c) (as dissected) are all constitutionally infirm for essentially the reasons asserted by Appellants.

The importance of the governmental interest is not at issue here. Appellants do not suggest that Kentucky's election finance statutes do not serve a compelling or "sufficiently important" governmental interest in the prevention of corruption and the appearance of corruption. *See Kentucky Right to Life, Inc. v. Terry*, 108 F.3d 637, 639 (6th Cir.1997) ("Numerous Kentucky public officials have been convicted of abusing their political offices for personal gain over the past twenty-five years. To address this serious problem, the Kentucky General Assembly passed the Campaign Finance Law....").[11]

10. See notes 1, 3 and 4, *supra*.

11. Appellants also do not challenge the $500 limitation on contributions established by KRS 121A.050(1) for the 1995 gubernatorial

campaign. The Patton/Henry slate agreed to that limitation when it filed its statement of intent to accept partial public financing. That agreement, however, does not affect Ap-

■ Nevertheless, the objectionable provisions, as written, cannot survive the close scrutiny required by *Buckley*. First, as Appellants point out, KRS 121.015(6)(e) directly contravened *Buckley* by defining as a "contribution" exactly the type of "independent expenditure" that *Buckley* held was subject to the closest scrutiny.

Second, KRS 121.150(1)(b) (as dissected) facially defined "independent expenditure" as, in part, an expenditure "not made . . . with any consultation involving a candidate." As Appellants point out, this definition would preclude a person who intended to post a billboard as an "independent expenditure" from discussing the merits of the candidate with his third-party neighbor. Moreover, the potential speaker could not even call the candidate's headquarters to inquire as to the candidate's position on a particular issue. Since KRS 121.150(1)(a) (as dissected) defines a contribution as, *inter alia*, "other than an 'independent expenditure,'" the definition affects not only independent expenditures, but also the limitations on contributions in KRS 121.150(1). It is neither narrowly tailored nor closely drawn to meet the governmental interests at issue and is, therefore, unconstitutional as written.

■ The prohibition in KRS 121.150(1)(c) (as dissected) of "any communication" between the campaign and the potential independent spender about the expenditure before the expenditure was made is even more seriously flawed. The hard core purpose of KRS 121.150(1) is not to prohibit "communications" but to prohibit "contributions" not made through the candidate's or slate's campaign manager or campaign treasurer. The existence or absence of a communication between a potential spender and a candidate, slate, or agent thereof is relevant only to whether an expenditure is a contribution or an independent expenditure. However, KRS 121.150(1)(c) (as dissected) prohibited the communication, itself, an even worse First Amendment violation than the "no contact" rule in 11 C.F.R. § 114.4(c)(5) that was struck down in *Clifton v. Federal Election Comm'n*, 114 F.3d 1309 (1st Cir.1997). "[W]e think it is beyond reasonable belief that, to prevent corruption or illicit coordination, the government could prohibit voluntary discussions between citizens and their legislators and candidates on public issues." *Id.* at 1314.

**B. Mootness.**

■ The Commonwealth asserts that the 1996 repeal of KRS 121.015(6)(e) and KRS 121.150(1)(c) (as dissected), and the amendment of the definition of "independent expenditure" to narrow its scope, moots Appellants' overbreadth challenge because those statutes are no longer "chilling" the exercise of anyone's First Amendment rights. This argument was embraced by a panel of the Sixth Circuit Court of Appeals in *Kentucky Right to Life, Inc. v. Terry, supra,* at 644–45, which premised its decision on what we conclude was an incorrect interpretation of *Massachusetts v. Oakes*, 491 U.S. 576, 109 S.Ct. 2633, 105 L.Ed.2d 493 (1989). *Terry*, 108 F.3d at 644. The Commonwealth and the Sixth Circuit's opinion rely on Justice O'Connor's plurality opinion in *Oakes*. 491 U.S. at 582–84, 109 S.Ct. at 2637–39. However, that opinion was joined by only

pellants' constitutional challenges to KRS 121.015, KRS 121.150, and KRS 121.990, which apply to all election campaigns, not just those that are publicly funded. It should be noted that KRS 121.150(6) also applied the $500 (now $1,000) limitation to all candidates (except school board candidates) whose campaigns were not publicly funded. That statute was upheld against a First Amendment challenge in *Kentucky Right to Life, Inc. v. Terry, supra,* at 648.

three other members of the Court with respect to that issue. The separate opinions of Justice Scalia (joined by Blackmun, J.) and Justice Brennan (joined by Marshall and Stevens, JJ.) both would have held that an intervening repeal of a facially overbroad statute does not moot an overbreadth challenge by one who stands convicted under the statute. *Id.* at 585–88, 591 n. 1, 109 S.Ct. at 2639–40, 2642 n. 1.

I join Part I of Justice Scalia's opinion holding that a defendant's overbreadth challenge cannot be rendered moot by narrowing the statute after the conduct for which he has been indicted occurred—the only proposition to which five Members of the Court have subscribed in this case.

*Id.* at 591 n. 1, 109 S.Ct. at 2642 n. 1 (Brennan, J. dissenting). Although the five votes fragmented between the concurring and dissenting opinions in *Oakes* cannot be characterized as a "holding" for purposes of *stare decisis, Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859 (1976) ("the holding of the Court may be viewed as that position taken by those members who concurred in the judgment on the narrowest grounds"), we find the reasoning supporting those five votes persuasive. *See especially* Justice Scalia's analysis of *Bigelow v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975). *Oakes, supra,* at 587 n. 1, 109 S.Ct. at 2640 n. 1. We conclude that Appellants' overbreadth challenge is not precluded by the mootness doctrine.

**C. Advisory Opinion Mechanism.**

■ The Commonwealth asserts that the advisory opinion mechanism in KRS 121.135, especially the "safe harbor" provision in KRS 121.135(4)(b), effectively eliminates any claim of facial overbreadth. KRS 121.135(4)(b) provides:

Notwithstanding any other provision of law, any person or committee to whom a written advisory opinion has been rendered who relies upon any provision or finding of the advisory opinion and who acts in good faith in accordance with the provisions and findings of an advisory opinion shall not, as a result of any act with respect to a transaction or activity addressed by the advisory opinion, be subject to any sanction provided by this chapter....

This issue was also raised in *Buckley* as a defense to a vagueness challenge, but was rejected because, at that time, the FECA advisory opinion statute, 2 U.S.C. § 437f (1970 ed., Supp. IV), afforded the right to request advisory opinions only to candidates, federal officeholders, and political committees. *Buckley,* 424 U.S. at 40 n. 47, 96 S.Ct. at 645 n. 47. As the Commonwealth points out, KRS 121.135(1) contains no such restriction. In further support of its position, the Commonwealth cites the following language in *Martin Tractor Co. v. Federal Election Comm'n,* 627 F.2d 375 (D.C.Cir.1980), a pre-enforcement challenge to the application of certain FECA provisions:

[T]o the extent that it offers a prompt means of resolving doubts with respect to the statute's reach, the advisory opinion (AO) mechanism written into the FECA, under which the Commission is authorized to give advice concerning the Act's application to specific factual situations, mitigates whatever chill may be induced by the statute and argues against constitutional adjudication on a barren record.

. . .

When a means like this one is available to reduce uncertainty or narrow the statute's reach and that means can be pursued at little risk to the rights asserted, the chill induced by facial vague-

ness *or overbreadth* is *pro tanto* reduced.

*Id.* at 384–86 (emphasis added).

Although the above quotation refers to "overbreadth," *Martin Tractor*, like *Buckley*, was, in fact, considering the effect of the advisory opinion mechanism on a claim of vagueness. 627 F.2d at 384. Regardless, we cannot agree that the advisory opinion mechanism cures or even *pro tanto* reduces the degree of overbreadth that existed in KRS 121.015(6)(e) and KRS 121.150(1)(c) (as dissected). The advisory opinion mechanism, as applied to these provisions, would have been resigned to continually interpreting an unconstitutional statute. All an advisory opinion could say with respect to, *e.g.*, whether a prospective expenditure would constitute a "contribution" under KRS 121.015(6)(e) is essentially "yes" or "no." If "no," the expenditure would be afforded a "safe harbor," and no enforcement or punitive action could be taken. But if "yes," then the otherwise valid conduct would be "chilled," and the overbreadth issue would still remain.

### D. Limiting Construction.

■ "When a . . . court is dealing with a . . . statute challenged as overbroad, it should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction." *New York v. Ferber*, 458 U.S. 747, 769 n. 24, 102 S.Ct. 3348, 3361 n. 24, 73 L.Ed.2d 1113 (1982). "Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." *Broadrick v. Oklahoma, supra*, at 613, 93 S.Ct. at 2916. *See also Massachusetts Citizens for Life, Inc., supra*, 479 U.S. at 248–49, 107 S.Ct. at 623 (construing the definition of "expenditure" in 2 U.S.C. § 432(9)(A) to mean "expenditure for express advocacy"); *Buckley, supra*, 424 U.S. at 41–44, 96 S.Ct.

at 645–47 (attempting to mute a vagueness challenge by construing the phrase "expenditure . . . relative to a clearly identified candidate" to mean "expenditure . . . advocating the election or defeat of a clearly identified candidate").

■ Appellants suggest that the process of upholding constitutionality by a limiting construction is precluded by the statement in Justice Brennan's dissent in *Oakes, supra*, at 591 n. 1, 109 S.Ct. at 2642 n. 1, that "a defendant's overbreadth challenge cannot be rendered moot by narrowing the statute after the conduct for which he has been indicted occurred." *Id.* at 591 n. 1, 109 S.Ct. at 2642. The distinction, of course, is that mootness is a procedural device that precludes consideration of the substance of a statute. The substance of a statute includes not only its words but the judicial construction placed on those words.

Indeed, in its very next term after rendering *Oakes*, the United States Supreme Court addressed precisely this argument in *Osborne v. Ohio*, 495 U.S. 103, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990). There, the challenged Ohio statute facially purported to prohibit the possession of "nude" photographs of minors, apparently contravening the Supreme Court's holding in *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213, 95 S.Ct. 2268, 2274, 45 L.Ed.2d 125 (1975), that depictions of nudity, without more, constitute protected expression. The Ohio Supreme Court narrowly construed the statute to prohibit "the possession or viewing of material or performance of a minor who is in a state of nudity, where such nudity constitutes a lewd exhibition or involves a graphic focus on the genitals, and where the person depicted is neither the child nor the ward of the person charged." 495 U.S. at 113, 110 S.Ct. at 1698.

Osborne contends that it was impermissible for the Ohio Supreme Court to apply its construction of § 2907.323(A)(3) to him—*i.e.*, to rely on the narrowed construction of the statute when evaluating his overbreadth claim. Our cases, however, have long held that a statute as construed "may be applied to conduct occurring prior to the construction, provided such application affords fair warning to the defendan[t]." *Id.* at 115, 110 S.Ct. at 1699 (*quoting Dombrowski v. Pfister, supra*, at 491 n. 7, 85 S.Ct. at 1123 n. 7).

The Court then determined that Osborne had fair warning of the narrowed construction because (1) it was obvious from the face of the statute that its goal was to eradicate child pornography and (2) the material in Osborne's possession consisted of photographs of adolescent boys in sexually explicit situations. "Therefore, although § 2907.323(A)(3) as written may have been imprecise at its fringes, someone in Osborne's position would not be surprised to learn that his possession of the four photographs at issue in this case constituted a crime." 495 U.S. at 116, 110 S.Ct. at 1700. *See also Hamling v. United States*, 418 U.S. 87, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974), construing a statute that proscribed the mailing of "obscene" matter. In *Hamling*, the United States Supreme Court rejected an overbreadth challenge by construing "obscenity," as used in the statute, "to be limited to the sort of 'patently offensive representations or depictions of that specific "hard core" sexual conduct given as examples in *Miller v. California*.'" *Id.* at 114, 94 S.Ct. at 2906.

We do not regard *Musselman v. Commonwealth*, Ky., 705 S.W.2d 476 (1986), or *Hatchett v. City of Glasgow*, Ky., 340 S.W.2d 248 (1960), as being contrary to these mainstream First Amendment precedents. *Hatchett* involved an interpretation of a provision of the T.V.A. Act, KRS 96.550, *et seq.*, that provides authority and procedures for acquisition by municipalities of privately owned electrical plants. 340 S.W.2d at 251. The T.V.A. Act does not purport to restrict First Amendment rights and has no application to a First Amendment overbreadth challenge. *Musselman* condemned "judicial expansion" of a statute by extending its scope to include conduct that could constitutionally be regulated but which was not within the plain meaning of the statute as written. 705 S.W.2d at 477. On the other hand, a limiting construction, sometimes referred to as "judicial narrowing," limits the scope of a statute by identifying conduct that can constitutionally be regulated and which is clearly within the meaning of the statute as written, thereby excluding, by a process akin to *ejusdem generis*, application of the statute to conduct that cannot constitutionally be regulated. See also our discussion, *infra,* of the "ex post facto/fair warning" issues raised by Appellants.

■ Among Kentucky precedents, only *Commonwealth v. Foley*, Ky., 798 S.W.2d 947 (1990), can be construed to prohibit the application of a limiting construction to uphold the constitutionality of a facially overbroad statute regulating First Amendment activities. *Id.* at 948–949. *Foley*, however, cited only *Hatchett, supra, Musselman, supra,* and *Coates v. Cincinnati*, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971), in support of that prohibition. As discussed above, neither *Hatchett* nor *Musselman* so held. And in declaring unconstitutional a Cincinnati loitering ordinance that prohibited "conduct . . . annoying to persons passing by," the Court in *Coates* noted that the Ohio Supreme Court had not sufficiently narrowed the scope of the ordinance, 402 U.S. at 613, 91 S.Ct. at 1688, and "[w]e are thus relegated, at best,

to the words of the ordinance itself." *Id.* at 614, 91 S.Ct. at 1688. Implicit in the Court's holding was a conclusion that the ordinance would have been upheld if the Ohio Supreme Court had narrowly construed it to apply only to activities that could constitutionally be regulated under the First Amendment. 402 U.S. at 613 n. 3, 91 S.Ct. at 1688 n. 3 (*citing Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942), which holds that an otherwise facially overbroad state statute that has been narrowly construed by the highest court of that state to apply only to activities that can constitutionally be regulated is not unconstitutional). Insofar as *Commonwealth v. Foley* can be construed to prohibit a limiting construction of a statute challenged as facially overbroad, we overrule it and follow the mainstream principle of judicial construction exemplified by *Osborne v. Ohio, Federal Election Comm'n v. Massachusetts Citizens for Life, New York v. Ferber, Buckley v. Valeo, Hamling v. United States, Broadrick v. Oklahoma,* and *Chaplinsky v. New Hampshire,* all *supra.* We express no opinion as to whether the provisions of KRS 119.205 that were struck down in *Foley* would have survived constitutional scrutiny even under a limiting construction. *Cf. Buckley, supra,* at 44–51, 96 S.Ct. at 647–50 (even as narrowly construed, former 18 U.S.C. § 608(e)(1) impermissibly burdened the constitutional right of free expression).

 Thus, we avoid invalidating KRS 121.150(1) by narrowly construing the phrase, "consultation involving a . . . candidate, slate of candidates . . . or agent" in the definition of "independent expendi-

ture," KRS 121.150(1)(b) (as dissected), as limited to "consultation with a . . . candidate, slate of candidates . . . or agent regarding the content, timing, place, nature or volume of the communication for which the expenditure is made." *Cf. Federal Election Commission v. Christian Coalition,* 52 F.Supp.2d 45, 92 (D.D.C.1999).[12]

 Appellants urge us to go further, as did *Christian Coalition,* and require not only that the consultation be about details of the proposed communication, as opposed to, *e.g.,* a mere inquiry into the position of the candidate on a particular issue, but also that the candidate "exercise control over" or engage in "substantial discussion or negotiation" with the potential spender about those specifics. *Id.* However, our polar star, *Buckley v. Valeo, supra,* defined a "contribution" as an expenditure placed in "cooperation with or with the consent of" the candidate, 424 U.S. at 78, 96 S.Ct. at 663, obviously concluding that this definition was "closely drawn to avoid unnecessary abridgment of associational freedoms." *Id.* at 25, 96 S.Ct. at 638. Similarly, the expenditures at issue in *Colorado Republican Campaign Comm. v. Federal Election Comm'n ("Colorado I"),* 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996), were held to be independent expenditures and not contributions because they were "not [made] pursuant to any general or particular understanding with a candidate." *Id.* at 614, 116 S.Ct. at 2315. (In fact, the expenditures at issue in *Colorado I,* were for advertisements opposing the election of a Democratic candidate and were made before the Republican candidate had been selected.) FECA de-

---

**12.** The definition fashioned in *Christian Coalition* was intended only to apply to what was termed an "expressive coordinated expenditure," 52 F.Supp.2d at 92, which the Federal Election Commission apparently regards as an expenditure for "a general public commu-

nication," *e.g.,* an advertisement. 11 C.F.R. § 100.23. However, those aspects of the definition that we have borrowed from *Christian Coalition* also apply to the type of expenditures alleged to have occurred in this case.

fines "independent expenditure" as one made "without cooperation or consultation with" the candidate and "not made in concert or cooperation with, or at the request or suggestion of" the candidate. 2 U.S.C. § 431(17).[13] We conclude that KRS 121.150(1)(b) (as dissected), as above construed, is "sufficiently narrowly tailored," *Austin v. Michigan Chamber of Commerce*, 494 U.S. 652, 660, 110 S.Ct. 1391, 1398, 108 L.Ed.2d 652 (1990), to withstand Appellants' overbreadth challenge.[14] However, no amount of judicial narrowing can cure the constitutional infirmities present in KRS 121.015(6)(e) and KRS 121.150(1)(c) (as dissected).

### E. Severability.

KRS 446.090, entitled "Severability," provides:

13. The statute was amended, effective November 6, 2002, to add the words "or cooperation." Pub.L. 107–155, Title II § 211. Title IV § 402, 116 Stat. 92, 112 (March 27, 2002).

14. Appellants insist that "exacting scrutiny," the label sometimes used by *Buckley* to refer to its standard of review, requires a search for "the most narrowly tailored means" of restricting communications. They then extend that argument to a conclusion that the 1996 amendments of KRS chapter 121, which, indeed, further narrowed the restrictions on campaign finance expenditures, conclusively prove that the 1995 version was unconstitutional because it did not employ "the most narrowly tailored means" of restriction, *i.e.*, those reflected by the 1996 amendments. We find this argument akin to an assertion that a statute is facially overbroad if it is possible to conceive of any impermissible application thereof. *See Houston v. Hill*, 482 U.S. 451, 458, 107 S.Ct. 2502, 2508, 96 L.Ed.2d 398 (1987) ("We have never held that a statute should be held invalid merely because it is possible to conceive of a single impermissible application.") (quotation omitted). In fact, "a law should not be invalidated for overbreadth unless it reaches a substantial number of impermissible applications...." *New York v. Ferber, supra,* 458 U.S. at 771, 102 S.Ct. at 3362 (*extending Broadrick v. Oklahoma, supra,* 413 U.S. at 615, 93 S.Ct. at 2917).

It shall be considered that it is the intent of the General Assembly, in enacting any statute, that if any part of the statute be held unconstitutional the remaining parts shall remain in force, unless the statute provides otherwise, or unless the remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the General Assembly would not have enacted the remaining parts without the unconstitutional part, or unless the remaining parts, standing alone, are incomplete and incapable of being executed in accordance with the intent of the General Assembly.

The compiler's notes to this statute explain that this section was originally creat-

"A substantial overbreadth rule is implicit in the chilling effect rationale ... [T]he presumption must be that only substantially overbroad laws set up the kind and degree of chill that is judicially cognizable." Moreover, "[without] a substantial overbreadth limitation, review for overbreadth would be draconian indeed. It is difficult to think of a law that is utterly devoid of potential for unconstitutionality in some conceivable application."

*Ferber,* 458 U.S. at 772 n. 27, 102 S.Ct. at 3362 n. 27 (*quoting* Note, *The First Amendment Overbreadth Doctrine,* 83 Harv. L.Rev. 844, 859, and n. 61 (1970)). *See also Hendricks v. Commonwealth,* Ky., 865 S.W.2d 332, 337 (1993).

The United States Supreme Court has used the phrase, "most narrowly tailored means," on only one occasion to date, *Norman v. Reed,* 502 U.S. 279, 294, 112 S.Ct. 698, 708, 116 L.Ed.2d 711 (1992), a case challenging the number of signatures that a "new political party" must obtain to acquire ballot access. The phrase was used in an isolated context and nothing in *Norman* suggests an intent to extend or depart from *Buckley* in that respect. For these reasons, we reject Appellants' assertion that exacting scrutiny, or its cousin "strict scrutiny," requires a potentially never-ending quest for "the most narrowly tailored means" of restricting campaign expenditures.

ed in order to obviate the necessity of attaching a severability clause to each act as it is passed.

 In *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 105 S.Ct. 2794, 86 L.Ed.2d 394 (1985), a similar severability clause in a state statute was invoked to remove unconstitutional language from a statute and thereby avoid total invalidation because of partial overbreadth. *Id.* at 507, 105 S.Ct. at 2803. Similar to the language in KRS 446.090, *Brockett* noted that "[p]artial invalidation would be improper if it were contrary to legislative intent in the sense that the legislature had passed an inseverable Act or would not have passed it had it known the challenged provision was invalid." *Id.* at 506, 105 S.Ct. at 2802–03. Even without a specific severability statute or clause, courts routinely sever unconstitutional provisions from overbroad statutes. "[I]f the . . . statute is not subject to a narrowing construction and is impermissibly overbroad, it nevertheless should not be stricken down on its face; if it is severable, only the unconstitutional portion is to be invalidated." *New York v. Ferber, supra,* 458 U.S. at 769 n. 24, 102 S.Ct. at 3361 n. 24 (*citing United States v. Thirty-Seven Photographs,* 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971)). Thus, in *Buckley v. Valeo, supra,* the Court severed those sections of the statutes that it had declared unconstitutional.

> Unless it is evident that the legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.

*Id.* 424 U.S. at 108–09, 96 S.Ct. at 677 (*quoting Champlin Refining Co. v. Corporation Comm'n,* 286 U.S. 210, 234, 52 S.Ct. 559, 565, 76 L.Ed. 1062 (1932)).

 We have no difficulty concluding that KRS 121.015(6)(e) and KRS 121.150(1)(c) (as dissected) are severable from the other valid provisions of those statutes. The valid provisions, standing alone, are complete and capable of being executed in accordance with the intent of the General Assembly. Obviously, the valid provisions are not so essentially and inseparably connected with and dependent upon the invalid provisions that the General Assembly would not have enacted the valid provisions without the invalid provisions. Proof positive of the accuracy of that conclusion is the fact that the General Assembly, itself, severed KRS 121.015(6)(e) and KRS 121.150(1)(c) (as dissected) from the statutory scheme in 1996.[15] Thus, we invoke KRS 446.090 and uphold the constitutionality of KRS 121.015(6) and KRS 121.150(1) by severing therefrom KRS 121.015(6)(e) and KRS 121.150(1)(c) (as dissected).

### F. Ex Post Facto/Fair Warning.

Appellants contend that the Ex Post Facto Clause, U.S. Const. art. I, § 10, Ky. Const. § 19(1), precludes application of our limiting construction of KRS 121.150(1)'s definition of "independent expenditure" to the indictment against them. We disagree. As noted *supra,* the United States Supreme Court explicitly held otherwise in *Osborne v. Ohio, supra,* so long as " 'such application affords fair warning to the defendan[t].' " *Id.* at 115, 110 S.Ct. at 1699 (*quoting Dombrowski, supra,* at 491 n. 7, 85 S.Ct. at 1123 n. 7). *See also Hamling, supra; Tharp v. Commonwealth,* Ky., 40 S.W.3d 356, 362–63 (2000). Appellants' reliance on *Bowie v. City of Columbia,* 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), is misplaced. The defendants in *Bowie* were charged with criminal trespass when they refused to leave a retail drug

---

**15.** *See* notes 1 and 4, *supra.*

store at which they were conducting a sit-in demonstration. South Carolina's trespass statute, S.C.Code § 16–386 (1952), prohibited "*[e]ntry* on lands of another after notice prohibiting same." (Emphasis added). The South Carolina Supreme Court "construed the statute to cover not only the act of entry on the premises of another after receiving notice not to enter, but also the act of *remaining* on the premises of another after receiving notice to leave." *Bouie*, 378 U.S. at 350, 84 S.Ct. at 1700–01 (emphasis added). Thus, as explained in *Hamling, supra*, Bouie involved an "unforeseeable and retroactive judicial expansion of narrow and precise statutory language," whereas a limiting construction, applied, as here, in response to an over-breadth challenge "add[s] a clarifying gloss" to the statute to make it "more definite" in its application to conduct sought to be restricted. *Hamling*, 418 U.S. at 115–16, 94 S.Ct. at 2907. See also our discussion, *supra*, of limiting construction.

▮▮▮ Our construction of the definition of "independent expenditure" in KRS 121.150(1) simply specifies conduct that was already included within the plain language of the statute and excludes any conduct that cannot constitutionally be restricted. Thus, Appellants had "fair warning" of the scope of the valid restrictions in accordance with *Osborne, supra*, at 116, 110 S.Ct. at 1700. Indeed, unlike the expansive construction in *Bouie, supra*, our limiting construction restricts the range of conduct that is subject to regulation under KRS 121.150(1)(a) (as dissected). "It is axiomatic that for a law to be *ex post facto* it must be more onerous than the prior law." *Dobbert v. Florida*, 432 U.S. 282, 294, 97 S.Ct. 2290, 2299, 53 L.Ed.2d 344 (1977). *See also Calder v. Bull*, 3 U.S. (3 Dall.) 386, 391, 1 L.Ed. 648 (1798) (No law "that mollifies the rigor of

criminal law" is within the prohibition of the Ex Post Facto Clause.).

Appellants' ex post facto challenge to our severance of KRS 121.015(6)(e) and KRS 121.150(1)(c) (as dissected) from the statutes fails for the same reasons. Severing these unconstitutional provisions only "mollifies the rigor" of the law, *Calder, supra*, at 391, and makes it "less onerous." *Dobbert, supra*, at 294, 97 S.Ct. at 2299. In fact, *Dobbert* noted that the "ultimate proof" that the new version of the statute was less onerous than the old was the fact that the old version was unconstitutional. *Id.* at 297, 97 S.Ct. at 2300.

## VI. VAGUENESS.

▮▮▮ "Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'" *Buckley v. Valeo, supra*, at 77, 96 S.Ct. at 662 (*quoting United States v. Harriss*, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989 (1954)). "[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75 L.Ed.2d 903 (1983). *See also Foley, supra*, 798 S.W.2d at 951; *Commonwealth v. Kash*, Ky.App., 967 S.W.2d 37, 43 (1997). Moreover, "[b]ecause First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *NAACP v. Button, supra*, 371 U.S. at 418, 83 S.Ct. at 338. However, "speculation about possible vagueness in hypothetical situations not before the Court will not

support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." *Hill v. Colorado,* 530 U.S. 703, 733, 120 S.Ct. 2480, 2498, 147 L.Ed.2d 597 (2000) (quotation omitted).

### A. "Directly or Indirectly."

 Appellants assert that use of the phrase "directly or indirectly" in KRS 121.150(1)(a) (as dissected) and "direct or indirect" in KRS 121.150(1)(b) (as dissected) render those provisions unconstitutionally vague. We disagree. Our very Constitution employs the same language in the context of sanctions for election campaign finance violations:

> [I]f any corporation shall, *directly or indirectly,* offer, promise or give, or shall authorize, *directly or indirectly,* any person to offer, promise or give any money or any thing of value to influence the result of any election in this State, or the vote of any voter authorized to vote therein, ... such corporation ... shall, on conviction thereof, forfeit its charter ... [or] all right to carry on any business in this State....

Ky. Const. § 150 (emphasis added). And in *Fanelli v. Commonwealth,* Ky., 418 S.W.2d 740 (1967), our predecessor Court upheld against a vagueness challenge the provision of KRS 61.190 that provides a penalty for "[a]ny public officer who shall receive, *directly or indirectly,* any interest, profits or perquisites arising from the use or loan of public funds...." *Id.* at 745 (emphasis added).

Nor have the federal courts expressed any constitutional qualms about regulating conduct committed "directly or indirectly."

> Funds provided to a candidate or political party or campaign committee either *directly or indirectly* through an intermediary constitute a contribution.

*Buckley v. Valeo, supra,* at 23–24 n. 24, 96 S.Ct. at 637 n. 24 (emphasis added).

In Part I we ... construed that term ["contribution"] to include not only contributions made *directly or indirectly* to a candidate, political party, or campaign committee, and contributions made to other organizations or individuals but earmarked for political purposes, but also all expenditures placed in cooperation with or with the consent of a candidate, his agents, or an authorized committee of the candidate.

*Id.* at 78, 96 S.Ct. at 663 (emphasis added).

In *United States Civil Service Comm'n v. National Ass'n of Letter Carriers, etc.,* 413 U.S. 548, 576–81, 93 S.Ct. 2880, 2896–98, 37 L.Ed.2d 796 (1973), the United States Supreme Court rejected overbreadth and vagueness challenges to Section 9(a) of the "Hatch Act," 5 U.S.C. § 7324(a)2, and its attendant regulations, one of which, 5 C.F.R. § 733.121(3), prohibited "*[d]irectly or indirectly* soliciting, receiving, collecting, handling, disbursing, or accounting for assessments, contributions, or other funds for a partisan political purpose." (Emphasis added.) In *Broadrick v. Oklahoma, supra,* the Court also upheld against identical challenges Oklahoma's version of the "Hatch Act," Okla. Stat. Ann., Tit. 74, § 818(5) and (6), which contained the same provisions. 413 U.S. at 618, 93 S.Ct. at 2908. And in *United States v. Goland,* 959 F.2d 1449 (9th Cir. 1992), where the defendant claimed his contributions were "independent expenditures" because the money was not paid *directly* to the campaign but to a political consultant who used the money to produce and broadcast commercials scripted by the contributor and read by the candidate, the Ninth Circuit Court of Appeals held that it was immaterial that the defendant made his illegal contribution "indirectly" as opposed to "directly." *Id.* at 1452.

The use of the phrase, "directly or indirectly," in KRS 121.150(1)(a) (as dissected)

gives adequate notice to a person of ordinary intelligence that a contribution to a candidate or state includes, *e.g.,* payment to a third party for the benefit of the candidate or state. We also conclude that use of the phrase, "direct or indirect," in the definition of "independent expenditure" gives adequate notice to a person of ordinary intelligence that the requisite "consent, request, suggestion or consultation" includes, *e.g.,* such a communication made to one acting on behalf of the potential spender, *e.g.,* a request by Martin and/or Ross that Fields and/or Winstead induce the Teamster PACs to pay Ross's salary.

### B. "Knowingly."

■ Appellants assert that statutes that restrict First Amendment freedoms require proof of "intent" as an element of any criminal sanction, thus the *mens rea* of "knowingly" required by KRS 121A.050(1) and KRS 121.990(3) is insufficient. Appellants cite only *Smith v. California,* 361 U.S. 147, 80 S.Ct. 215, 4 L.Ed.2d 205 (1959), for this proposition. However, *Smith* struck down the obscenity ordinance at issue in that case precisely because it did *not* require the *mens rea* element of scienter, *i.e.,* knowledge by the defendant bookseller of the content of the allegedly obscene book. *Id.* at 154–55, 80 S.Ct. 215. And in *New York v. Ferber, supra,* it was held on appeal of a child pornography conviction that "criminal responsibility may not be imposed without some element of scienter on the part of the defendant." 458 U.S. at 765, 102 S.Ct. at 3358. We also note that 2 U.S.C. § 441b(a) makes it unlawful "knowingly to accept or receive" a contribution from a national bank, corporation, or labor organization, and that 2 U.S.C. § 441c(a)(2) makes it unlawful "knowingly to solicit" a contribution from a government contractor. It was held in *Federal Election Comm'n v. Dramesi for Congress Committee,* 640 F.Supp. 985 (D.N.J.1986), that a " 'knowing' standard, as opposed to a 'knowing and willful' one, does not require knowledge that one is violating a law, but merely requires an intent to act." *Id.* at 987. *See also Federal Election Comm'n v. Friends of Jane Harman, supra,* note 5, at 1056 n. 11. We conclude that "knowingly" is a sufficient *mens rea* to support a criminal conviction of violating Kentucky's campaign finance laws.

■ Appellants next contend that KRS 121.015(10)'s definition of "knowingly" to mean "aware or should have been aware" denies them due process of law because it authorizes their convictions under a negligence standard. But *Smith v. California, supra,* did not foreclose the possibility that something less than actual knowledge could support a conviction, even under a statute restricting First Amendment rights.

> We need not and most definitely do not pass today on what sort of mental element is requisite to a constitutionally permissible prosecution of a bookseller for carrying an obscene book in stock; ... whether there might be circumstances under which the State constitutionally might require that a bookseller investigate further, or might put on him the burden of explaining why he did not, and what such circumstances might be.

*Id.* at 154, 80 S.Ct. at 219.

Subsequent cases have held that actual knowledge is not a prerequisite to conviction under criminal statutes implicating the First Amendment. *E.g., Hamling v. United States, supra,* 418 U.S. at 120, 94 S.Ct. at 2909, rejecting an argument that conviction under an obscenity statute required proof that the defendant "knew or believed that such [material] could be properly or justly characterized as obscene" and holding that the proper inquiry

was whether (1) the material was, in fact, obscene and (2) the defendant "knew or had notice" at the time of its content (not whether he knew or believed it was obscene which, of course, would constitute a *mens rea* of "intent"); *Ginsberg v. New York,* 390 U.S. 629, 643–44, 88 S.Ct. 1274, 1283, 20 L.Ed.2d 195 (1968), rejecting a vagueness challenge to a pornography statute defining "knowingly" as "having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry...."

Other First Amendment cases upholding similar definitions of "knowingly" include *Newman v. Conover,* 313 F.Supp. 623, 630 (N.D.Tex.1970) (defining "constructive knowledge" as "knowledge of facts which would put a reasonable and prudent man on notice as to the suspect nature of the material"); *Taylor v. State ex rel. Kirkpatrick,* 529 S.W.2d 692, 694 (Tenn.1975) (same); *State v. Scott,* 460 S.W.2d 103, 105 (Tex.1970) (same); *Commonwealth v. Doe,* 316 Pa.Super. 1, 462 A.2d 762, 766 (1983) ("having general knowledge of or reason to know, or a belief or ground for belief which warrants further inspection or inquiry or both"); *Great Speckled Bird of Atlanta Coop. News Project v. Stynchcombe,* 298 F.Supp. 1291, 1292 (N.D.Ga.1969) ("reasonably should know"); *State v. Yabe,* 114 Ariz. 89, 559 P.2d 209, 211 (Ct.App. 1977) ("having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry"); *State v. Burch,* 365 So.2d 1263, 1266 (La.1978) ("knew or had reason to know"); *Commonwealth v. Rosenberg,* 379 Mass. 334, 398 N.E.2d 451, 454–55 (1979) ("had seen, or should have seen"). And in *Burns v. State,* 256 Ark. 1008, 512 S.W.2d 928 (1974), the Arkansas Supreme Court upheld a jury instruction defining "knowingly" as "was aware or should have been aware," precisely the language challenged here. *Id.* at 934.

We recognize that the Model Penal Code definition of "knowingly" requires actual knowledge, *Model Penal Code and Commentaries,* Part I, § 2.02 cmt. 2 (A.L.I. 1985), and that the definition of "knowingly" in KRS 501.020(2) defines the term even more narrowly than does the Model Code. Robert G. Lawson and William H. Fortune, *Kentucky Criminal Law* § 2–2(c)(1) (Lexis 1998). That, however, does not mean that a different approach is unconstitutional. Our inquiry is not whether KRS 121.015(10) "ought" to require actual knowledge but whether requiring less denies Appellants their Due Process and First Amendment rights. Those statutes that require only something similar to constructive knowledge are premised upon a recognition that "wilful blindness" is equivalent to knowledge. *See* Lawson and Fortune, *supra,* § 2–2(c)(2); Rollin M. Perkins, *Criminal Law,* ch. 7, § 4C (2d ed. Found. Press 1969).

> [O]ne with [a deliberate antisocial purpose] may deliberately "shut his eyes" to avoid knowing what would otherwise be obvious to view. In such cases, so far as criminal law is concerned, the person acts at his peril in this regard, and is treated as having "knowledge" of the facts as they are ultimately discovered to be.

Perkins, at 776. Thus, in *Commonwealth v. Griffin,* Ky., 759 S.W.2d 68 (1988), we held that the *mens rea* element of "knowingly or having reason to believe" in KRS 514.150 was sufficient to uphold a criminal conviction. *Id.* at 69. Similarly, we now hold that the *mens rea* element of "aware or should have been aware" in KRS 121.015(10) suffices to support a criminal conviction under KRS 121.990(3) because it requires Appellants to have sufficient knowledge of the nature of their conduct so as not to deny them their Due Process and First Amendment rights.

Accordingly, we affirm the Court of Appeals and remand this case to the Franklin Circuit Court for further proceedings not inconsistent with this opinion.

LAMBERT, C.J.; GRAVES, KELLER and WINTERSHEIMER, JJ., concur.

JOHNSTONE, J., dissents by separate opinion.

STUMBO, J., not sitting.

JOHNSTONE, Justice, dissenting.

The trial judge in this case correctly ruled that KRS 121.150(1)[1] is unconstitutional on its face and cannot be enforced against the appellants. Because the majority opinion erroneously affirms the Court of Appeals' opinion that reverses that decision, I respectfully dissent.

### I. *Introduction*

The indictment against the appellants alleges that they violated KRS 121.150(1) by "knowingly making or receiving a contribution of a thing of value which was neither an independent expenditure to support or defeat a candidate nor made to the duly appointed campaign manager or campaign treasurer of the Patton/Henry slate of candidates." As made clear by the allegations contained in the Bill of Particulars, these charges involve expenditures made by third parties that allegedly benefitted the Patton/Henry gubernatorial campaign. The majority opinion accepts this assessment in concluding that "Appellants were indicted for making contributions ... in the form of 'coordinated' expenditures to the Patton/Henry slate...." *Op.* at 50–51. But the majority's use of the term "coordinated expenditures" is misleading.

The term "coordinated expenditure" comes from the U.S. Supreme Court's seminal case on campaign-finance regulation. *Buckley v. Valeo,* 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In *Buckley,* the U.S. Supreme Court addressed the constitutionality of "key provisions of the Federal Election Campaign Act of 1971 [FECA]." *Id.* at 6, 96 S.Ct. at 629, 46 L.Ed.2d at 680. The case stands as the benchmark against which the constitutionality of all other campaign-finance regulation is made. The majority attempts to shoehorn KRS 121.150(1) into *Buckley*'s dictates through verbal manipulation and gerrymandering. But *Buckley*'s limits on the General Assembly's reach are not as malleable as the majority suggests.

As used in *Buckley,* "coordinated expenditure" is clearly defined by statute to mean an expenditure "authorized or requested by a candidate." But the majority construes KRS 121.150(1) to define "coordinated expenditure" as any campaign-related expenditure that is not "independent" within the meaning of the statute. In other words, under the majority's construction of the statute, "coordinated expenditure" is defined expansively in terms of what it is not rather than in terms of what it is. Under this reverse definition, "coordinated expenditures" embrace a wide range of campaign-related expenditures that constitutionally can be neither limited in amount nor required to be disclosed. Thus, the majority opinion's narrowing construction of KRS 121.150(1)'s definition of "independent expenditure" merely expands the statute's definition of "coordinated expenditure" and fails to correct the statute's inherent constitutional flaw.

### II. *Discussion*

As did the majority, I begin my discussion with *Buckley* and its discussion on spending limits.

---

1. All statutory citations in this dissent are to the 1994 versions of the statute.

Section 608 of FECA prohibited "individuals from contributing more than $25,000 in a single year or more than $1,000 to any single candidate for an election campaign and from spending more than $1,000 a year 'relative to a clearly identified candidate.'" *Id.* at 13, 96 S.Ct. at 631–32, 46 L.Ed.2d at 684. (*Buckley* referred to the expenditures encompassed by § 608 as "independent expenditures.") While limits on both campaign-related contributions and expenditures "operate in an area of the most fundamental First Amendment activities," the *Buckley* Court determined that limits on campaign-related expenditures deserve closer scrutiny than restrictions on campaign-related contributions. *Id.* at 14–23, 96 S.Ct. at 632–36, 46 L.Ed.2d at 684–90. The Court made, and has continued to carefully maintain this distinction, because "[r]estraints on expenditures generally curb more expressive and associational activity than limits on contributions do." *Federal Election Commission v. Colorado Republican Federal Campaign Committee*, 533 U.S. 431, 440, 121 S.Ct. 2351, 2358, 150 L.Ed.2d 461, 472 (2001). Accordingly, the *Buckley* Court upheld FECA's spending limits on contributions, but struck down the spending limits on expenditures.

The *Buckley* Court's discussion of FECA's spending limit provisions is important to this case, because this is where *Buckley*'s discussion of "coordinated expenditures" is found; however, it takes a bit of explanation to get there. In beginning its spending-limit discussion, the *Buckley* Court stated:

The Act's expenditure ceilings impose direct and substantial restraints on the quantity of political speech. The most drastic of the limitations restricts individuals and groups, including political parties that fail to place a candidate on the ballot, to an expenditure of $1,000 "relative to a clearly identified candidate

during a calendar year." § 608(e)(1). Other expenditure ceilings limit spending by candidates, § 608(a), their campaigns, § 608(c), and political parties in connection with election campaigns, § 608(f). It is clear that a primary effect of these expenditure limitations is to restrict the quantity of campaign speech by individuals, groups, and candidates. The restrictions, while neutral as to the ideas expressed, limit political expression "at the core of our electoral process and of the First Amendment freedoms."

*Buckley*, 424 U.S. at 39, 96 S.Ct. at 644, 46 L.Ed.2d at 699.

The *Buckley* Court concluded that § 608(e)(1) was unconstitutionally vague because the

key operative language of the provision limits "any expenditure . . . relative to a clearly identified candidate." Although "expenditure," "clearly identified," and "candidate" are defined in the Act, there is no definition clarifying what expenditures are "relative to" a candidate. The use of so indefinite a phrase as "relative to" a candidate fails to clearly mark the boundary between permissible and impermissible speech, unless other portions of § 608(e)(1) make sufficiently explicit the range of expenditures covered by the limitation.

*Id.* at 41–42, 96 S.Ct. at 645, 46 L.Ed.2d at 700.

The *Buckley* Court, however, determined that the range of expenditures covered by § 608(e)(1) could be made sufficiently explicit by construing the phrase "relative to a candidate" to mean "advocating the election or defeat of a candidate." *Id.* at 42, 96 S.Ct. at 645–46, 46 L.Ed.2d at 700–01. Still, this did not eliminate the vagueness problem because

the distinction between discussion of issues and candidates and advocacy of

election or defeat of candidates may often dissolve in practical application. Candidates, especially incumbents, are intimately tied to public issues involving legislative proposals and governmental actions. Not only do candidates campaign on the basis of their positions on various public issues, but campaigns themselves generate issues of public interest.

*Id.*

The *Buckley* Court then held that the vagueness problem with § 608(e)(1) only could be eliminated by further limiting the reach of the statute's spending limits by construing it "to apply only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Id.* at 44, 96 S.Ct. at 646–47, 46 L.Ed.2d at 702. Even so narrowly and explicitly construed, the statute was still unconstitutional because "the governmental interest in preventing corruption and the appearance of corruption is inadequate to justify § 608(e)(1)'s ceiling on independent expenditures." *Id.* at 45, 96 S.Ct. at 647, 46 L.Ed.2d at 702. One of these governmental interests is of great importance to this case.

The proponents of § 608(e)(1) argued that the statute was necessary to

> prevent would-be contributors from avoiding the contribution limitations by the simple expedient of paying directly for media advertisements or for other portions of the candidate's campaign activities ... [and] *that expenditures controlled by or coordinated with the candidate and his campaign might well have virtually the same value to the candidate as a contribution* and would pose similar dangers of abuse.

*Id.* at 46, 96 S.Ct. at 647, 46 L.Ed.2d at 703 (emphasis added). The *Buckley* Court rather summarily dismissed this argument by noting that "such *controlled or coordinated expenditures* are treated as contributions rather than expenditures under the Act." *Id.* at 46, 96 S.Ct. at 647–48, 46 L.Ed.2d at 703 (emphasis added). The argument had no merit because "Section 608(b)'s contribution ceilings rather than § 608(e)(1)'s independent expenditure limitation prevent attempts to circumvent the Act through prearranged or coordinated expenditures amounting to disguised contributions." *Id.* at 46–47, 96 S.Ct. at 648, 46 L.Ed.2d at 703–04.

Thus, under *Buckley*, "coordinated expenditure" means an expenditure "authorized or requested by the candidate, an authorized committee of the candidate, or an agent of the candidate." *Id.* at 46, n. 53, 96 S.Ct. at 648, n. 53, 46 L.Ed.2d at 703, n. 53 (citing § 608(c)(2)(B) of the Act). KRS Chapter 121's definition of section does not define "contribution" to include coordinated expenditures as that term is used in *Buckley*. Rather, the only definition of "contribution" that applies to expenditures of any sort is KRS 121.015(6)(e): "'Contribution' means any ... [e]xpenditure in connection with any other activity undertaken independently of the activities of a candidate, slate of candidates, committee, or contributing organization made or furnished for the purposes of influencing the results of an election." This definition is unconstitutional on its face because it includes "exactly the type of independent activity that *Buckley* held could not be restricted." *Op.* at 50. The definition is void and has no effect. Further, KRS Chapter 121's definition of section does not define either the term "expenditure" or "coordinated expenditure." Therefore, any definition of those terms must be found in KRS 121.150(1) itself.

KRS 121.150(1) places affirmative obligations on all persons or groups who make

expenditures to support or defeat a candidate ("campaign-related expenditures"). The form of the obligation depends on the type of expenditure made. "independent" campaign-related expenditures over $500 must be reported directly to the Registry. All other campaign-related expenditures must be made through a "duly appointed campaign manager, or campaign treasurer." The majority opinion considers these non-independent, campaign-related expenditures to be "coordinated expenditures" that can be treated as "contributions" under *Buckley*. *See Op.* at 50–51. The Commonwealth clearly gives the statute this construction. The Bill of Particulars alleges that the appellants "violated KRS 121.150(1) by contributing a 'thing of value' to the Patton campaign [that] was not made to [Patton's] campaign manager or ... treasurer ... and which was not an *independent expenditure*." (Emphasis added). Thus, while KRS 121.150(1) does not expressly define "coordinated expenditure," it implicitly defines it in terms of what is not an "independent expenditure." This inclusive and implicit definition is contrary to the exclusive and explicit definition of the same term in *Buckley*. This difference in definition is what makes KRS 121.150(1) unconstitutionally overbroad on its face.

KRS 121.150(1) defines the term "independent expenditure" to mean an expenditure

made for a communication which expressly advocates the election or defeat of a clearly identified candidate or slate of candidates, or the passage or defeat of a constitutional amendment or public question which will appear on the ballot and which is not made with any direct or indirect cooperation, consent, request, suggestion, or consultation involving a candidate, slate of candidates, campaign committee, political issues committee, or agent.

The above definition is detailed, precise and, well, definite. It is the inverse of *Buckley's* definition of the same term. *Buckley* uses the term "independent expenditure" broadly and indefinitely to refer to FECA's spending limits on all "expenditures by individuals and groups 'relative to a clearly identified candidate.'" *Buckley*, 424 U.S. at 7, 96 S.Ct. at 629, 46 L.Ed.2d at 681. Thus, *Buckley's* use of the term "independent expenditure" corresponds the closest with KRS 121.150(1)'s phrase "expenditures ... made ... to support or defeat a candidate." On the other hand, KRS 121.150(1)'s definition of "independent expenditure" corresponds with *Buckley's* narrow and explicit construction of the term "expenditure."

The language "expressly advocates the election or defeat of a clearly identified candidate" contained in KRS 121.150(1)'s definition of "independent expenditure" is obviously patterned after the *Buckley* Court's narrow construction of § 608(e)(1), which limited that statute's application "only to expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate for federal office." *Buckley*, 424 U.S. at 44, 96 S.Ct. at 646–47, 46 L.Ed.2d at 702. Recall that the *Buckley* Court narrowly construed § 608(e)(1) this way to avoid the inherent vagueness problem of applying FECA's spending limits to "independent expenditures" as that term was used in *Buckley*. Further recall that, by definition, expenditures that were "authorized or requested by a candidate" (coordinated expenditures) were excluded from the definition of "independent expenditures" in *Buckley*. Thus, under *Buckley's* narrow construction of § 608, "expenditures" comprised a small, discrete subset of the whole set of "independent expenditures," as that term is used in *Buckley*.

Unlike *Buckley,* under KRS 121.150(1) it is "independent expenditures" that comprise a small, discrete subset of a much greater set. This greater set consists of all "expenditures . . . made . . . to support or defeat a candidate." But the greater set of KRS 121.150(1) is larger than Buckley's set of "independent expenditures" because, under *Buckley,* "independent expenditures" expressly excluded expenditures "authorized or requested by a candidate," whereas such expenditures are not excluded from KRS 121.150(1)'s phrase "expenditures . . . made . . . to support or defeat a candidate" and, thus, necessarily fall somewhere within it. But also falling within that phrase are expenditures made for "exactly the type of independent activity that *Buckley* held could not be restricted." Therefore, under *Buckley,* all expenditures "relative to a clearly identified candidate" ("independent expenditures") that are not "expenditures for communications that in express terms advocate the election or defeat of a clearly identified candidate" ("expenditures") are campaign-related expenditures that constitutionally can be subject to neither spending limits nor reporting requirements. On the other hand, under KRS 121.150(1) "expenditures . . . made . . . to support or defeat a candidate" (all campaign-related expenditures) that are not "independent expenditures" within the meaning of the statute, include both "independent expenditures" and "coordinated expenditures" as those two terms are used in *Buckley.* Thus, in the context of the case at bar, the statute's constitutional infirmity lies not in the type of expenditures included in KRS 121.150(1)'s definition of "independent expenditure," but rather, the infirmity lies in the type of expenditures excluded by the definition, which indiscriminately includes both "independent expenditures" and "coordinated expenditures" as those terms are used in *Buckley.* And it applies to these campaign-related expenditures in a way prohibited by *Buckley,* as can be shown through *Buckley*'s discussion of FECA's disclosure and reporting provisions.

Reporting and disclosure are not the same thing. "Disclosure" refers to statutory provisions that compel *political candidates, parties and committees* to keep detailed records of contributions and expenditures and to disclose this information through regular pre- and post-election reports to a governmental agency. *See Buckley,* 424 U.S. at 60–63, 96 S.Ct. at 654–55, 46 L.Ed.2d at 711–12 (emphasis added). "Reporting" refers to statutory provisions that require "direct disclosure of what *an individual or group* contributes or spends." *Id.* at 75, 96 S.Ct. at 661, 46 L.Ed.2d at 719 (emphasis added).

The Kentucky disclosure provisions require *any candidate, slate of candidates, or political issue committee* to make a report to the Kentucky Registry of Election Finance ("Registry") that includes *inter alia* a list of the full name, address, occupation and employer of any person making a contribution over $100, as well as the date on which the contribution was made; and (2) a "complete statement of all expenditures authorized, incurred or made." KRS 121.180(3)(a). In turn, the Registry is required to make these reports available for inspection and copying. KRS 121.120(4)(f). These provisions are very similar to those in FECA, which were discussed in *Buckley.* *Id.* at 62–64, 96 S.Ct. at 655–56, 46 L.Ed.2d at 712–13.

The *Buckley* Court held that FECA's disclosure requirements were constitutional. *Id.* at 64–68, 96 S.Ct. at 655–56, 46 L.Ed.2d at 713–16. Likewise, and for the same reasons which are not relevant here, I believe that the Kentucky disclosure statutes are constitutional. But *Buckley*'s "disclosure" discussion is not relevant to the case at bar. Rather, what is relevant

is *Buckley*'s discussion and examination of FECA's reporting statute, § 434.

Section 434 of FECA imposed no spending limits on either contributions or expenditures. Instead, it required "every person (other than a political committee or candidate) who makes contributions or expenditures aggregating over $100 in a calendar year other than by contribution to a political committee or candidate to file a statement with the [Federal Election Commission]." *Id.* at 74–75, 96 S.Ct. at 661, 46 L.Ed.2d at 719 (internal quotation marks omitted). Violation of the statute carried criminal penalties. *Id.* at 76, 96 S.Ct. at 661, 46 L.Ed.2d at 720. Similarly, KRS 121.150 imposes no limits on either campaign-related contributions or expenditures. Instead, it requires that all contributions and expenditures, other than "independent expenditures," be made only through [a] candidate's campaign manager or treasurer. "Independent expenditures" over $500 are to be directly reported to the Registry. And, violation of the statute is a felony offense. KRS 121.990(3). In the context of this case, the only possible difference in the two statutes is KRS 121.150(1)'s bifurcation of reporting requirements between (1) the Registry, and (2) "only through [a] duly appointed campaign manager." The difference is of no practical consequence.

First of all, it was § 434's criminal penalties for individuals and groups who failed to report a contribution or expenditure that caused the *Buckley* Court the most concern about the statute's constitutionality. *See Buckley*, 424 at 76–77, 96 S.Ct. at 662, 46 L.Ed.2d at 720 (§ 434 "raises serious problems of vagueness, particularly treacherous where, as here, the violation of its terms carries criminal penalties and fear of incurring these sanctions may deter those who seek to exercise protected First Amendment rights."). Further, KRS

121.150(1)'s requirement that a campaign-related contribution or non-independent expenditure shall be made "only through [a] duly appointed campaign manager, or campaign treasurer" is, for all practical purposes, a reporting requirement.

While no report is made directly to the Registry under the "through [a] duly appointed campaign manager" requirement, the candidate, through whose campaign manager the contribution or non-independent expenditure is made, is required to file a detailed report of the information to the Registry. KRS 121.180(3)(a). This report includes the full name and address of the person making the contribution or expenditure. In turn, the Registry is required to make these reports available for public inspection and copying. KRS 121.120(4)(f). From the standpoint of the person or group making a campaign-related contribution or expenditure, there is no appreciable difference between directly reporting vital information about a campaign-related contribution or expenditure to the Registry and indirectly reporting the same information through a "duly appointed campaign manager." Therefore, the reach of KRS 121.150(1)'s reporting requirement is necessarily constrained by what is constitutionally permissible under *Buckley* and its progeny, because (1) neither § 434 nor KRS 121.150(1) imposes any constraints on the amount of campaign-related contributions or expenditures that individuals or groups can make, (2) both KRS 121.150(1) and § 434 of FECA affirmatively require individuals and groups to report campaign-related contributions and expenditures, (3) violation of both statutes is a criminal offense, and (4) both statutes' reporting requirements implicate core First Amendment rights.

In its discussion of § 434, the *Buckley* Court separately examined the constitu-

tionality of the statute as applied to contributions and expenditures, just as it did in its discussion of FECA's spending-limit provisions. In this discussion, the Court noted that FECA's reporting and disclosure provisions used the same definition of "contribution" as was used in the spending limit provisions. *Buckley*, 424 U.S. at 78, 96 S.Ct. at 663, 46 L.Ed.2d at 721. That is, FECA defined "contribution" to include expenditures "authorized or requested" by a candidate for purposes of § 434. The *Buckley* Court held that the reporting provisions were constitutional as applied to contributions because, "[s]o defined, 'contributions' have a sufficiently close relationship to the goals of the Act, for they are connected with a candidate or his campaign." *Id.* at 78, 96 S.Ct. at 663, 46 L.Ed.2d at 721–22. The individual reporting requirements of § 434 as applied to "expenditures" gave the Court more pause.

Just as it began its discussion on FECA's spending-limit provisions, the *Buckley* Court began its discussion of § 434 by addressing an inherent vagueness problem with the statute. This time, the language that gave the Court trouble was the phrase "for the purpose of ... influencing an election or nomination," which the Court determined had the "potential for encompassing both issue discussion and advocacy of a political result." *Id.* at 79, 96 S.Ct. at 663, 46 L.Ed.2d at 722. The Court concluded that this was overbroad. *Id.* at 79–80, 96 S.Ct. at 663–64, 46 L.Ed.2d at 722. Thus, to insure that the reach of § 434(e) was not impermissibly broad, the *Buckley* Court construed "expenditure" for purposes of § 434 in the same way it construed "expenditure" in FECA's spending-limit provisions, *i.e.*, "to reach only funds used for communications that expressly advocate the election or defeat of a clearly identified candidate." *Id.* at 80, 96 S.Ct. at 664, 46

L.Ed.2d at 722. But unlike § 608's spending limits on expenditures, the *Buckley* Court held that § 434's reporting requirement of expenditures was constitutional in light of its narrow construction of the statute because it bore a "sufficient relationship to [the] substantial governmental interest[s]" of preventing election corruption and the appearance of corruption. *Id.* at 80, 96 S.Ct. at 664, 46 L.Ed.2d at 722.

In concluding its § 434 discussion, the *Buckley* Court provided a summary of when § 434(e), as construed, imposed independent reporting requirements on individuals and groups that were not candidates or political committees. Reporting under the statute was required

> only in the following circumstances: (1) when they make contributions earmarked for political purposes or *authorized or requested by a candidate or his agent, to some person other than a candidate or political committee,* and (2) when they make expenditures for communications that expressly advocate the election or defeat of a clearly identified candidate.

*Id.* at 80, 96 S.Ct. at 664, 46 L.Ed.2d at 722–23 (emphasis added).

The "authorized or requested" language mirrors FECA's description of the types of expenditures (coordinated) that are included in the definition of "contribution" and, consequently, that are excluded from the definition of "expenditure." Thus, under *Buckley*, the General Assembly may only require individuals and groups, who are not candidates or political committees, to report expenditures (1) that are authorized or requested by a candidate or his or her agent, or (2) that are made for communications that expressly advocate the election or defeat of a clearly identified candidate. By defining "coordinated expenditures" as any expenditure that is not "independent"

within the meaning of the statute, KRS 121.150(1) goes much further than *Buckley* allows.

KRS 121.150(1) requires the reporting of *all* expenditures made "to support or defeat" a candidate or slate of candidates, except "independent expenditures" under $500. This requirement indiscriminately embraces both direct advocacy and the discussion of issues. It applies exactly to the type of "independent expenditures" that the government cannot require to be reported. The statute is too broad. The majority's narrowing construction of the term "independent expenditure" does nothing to solve this problem, because it only affects to whom campaign-related expenditures have to be reported; it fails to affect the range of campaign-related expenditures that are required to be reported under the statute, which is where the constitutional infirmity of the statute lies.

Finally, KRS 121.150(1)'s definition of "coordinated expenditures" in terms of what it is not rather than in terms of what it is, creates yet another problem that makes the statute unenforceable. Under the majority's construction of KRS 121.150(1), to prove violation of the statute at trial, the Commonwealth will have to show that the alleged expenditures (1) were made to support or defeat a candidate, and (2) the expenditures were not "independent" as that term has been construed by the majority. Thus, all non-"independent expenditures" are non-rebuttably presumed to be "coordinated" under KRS 121.150(1). This presumption is not enforceable. *See Federal Election Commission v. Colorado Republican Federal Campaign Committee*, 518 U.S. 604, 621–22, 116 S.Ct. 2309, 2319, 135 L.Ed.2d 795, 809 (1996).

### III. *Conclusion*

KRS 121.150(1) is unconstitutional on its face because it requires campaign-related expenditures to be reported that cannot be required to be reported under *Buckley*, and because it creates the impermissible presumption that all non-independent expenditures are "coordinated." Because the reporting requirement applies to all expenditures made to support or defeat a candidate, it inescapably reaches expenditures that neither expressly advocate the election or defeat of a clearly identified candidate nor are authorized or requested by a candidate. The majority's attempt to save the constitutionality of the statute through a narrow construction of the term "independent expenditure" misses the mark because it does not limit the type of campaign-related expenditures that are subject to the statute's reach. Finally, the unconstitutionality of the statute renders all the charges in the indictment against the appellants unenforceable.

Counts I and IV of the Indictment cannot be maintained because they allege a violation of KRS 121.150(1), which is unconstitutional and cannot be enforced against the appellants.

Count II of the Indictment cannot be maintained because the Bill of Particulars alleges that appellant Martin violated KRS 121.150(12) because he "knowingly accepted a contribution made by Ross, Fields and Winstead." But the alleged "contribution" is in the form of an expenditure. The applicable definition of contribution that applies to expenditures is unconstitutional on its face. Therefore, any expenditure made or received by the appellants cannot be considered a "contribution" within the meaning of KRS 121.150(12).

Counts III and V of the Indictment cannot be maintained because the charges are based on the allegation that the appellants violated KRS 121.150(1). Because the statute is unconstitutional, there is no underlying offense to support the allegation.

For the reasons set forth above, I respectfully dissent.